# HEIRS AND ADM'R OF HITCHCOCK v. THE UNITED STATES BANK OF PENNSYLVANIA.

1. Henry Hitchcock, a resident of Mobile, indebted to the Pennsylvania Bank of the United States, went to Philadelphia, and whilst there, proposed to the directory of the Bank, to advance him a further sum of money in Mobile; agreeing, upon that condition, to execute his bonds payable by four yearly instalments, for the entire debt, with interest, at eight per cent. per annum, payable in the city of New York; and also upon the receipt of the money, to execute a mortgage to secure the entire debt upon real estate in Alabama. The Bank acceded to the proposition, and appointed an agent to execute it on their part. The contract was executed by both parties; the Bank delivering the money, and Mr.

Heirs and Adm'r of Hitchcock v. The United States Bank of Pennsylvania.

H. executing his bond and mortgage in Mobile : *Held*,—First—that the proposition made in Philadelphia was not the contract of the parties, but a proposal to make a future contract, which was afterwards executed in Mobile, and which must be considered as the place of the contract.

Second,—that as no intention appeared to violate or evade the usury law of New York, the contract, though the money was payable there, was not void, notwithstanding, by the law of that State, all contracts for the payment of money, reserving a higher rate of interest than seven *per cent. per annum*, were *declared* invalid.

Third,—that the mortgage given to secure the payment of the debt, could be foreclosed in Alabama.

2. The proviso to the act of 1818, restraining Banks in their loans, and discounts, to six *per cent. per annum*, is obsolete.

3. A foreign corporation, exercising one of it scorporate functions by the comity of this State, within its limits, must conform itself to our laws. A prohibition in the charter, that it shall not, within the State of its creation, take more than six per cent. *per annum*, on its loans or discounts, does not follow it into a foreign State, by whose comity it is permitted to make contracts.

4. H. made his will, containing the following clause : " For the purpose of having my estate properly settled, and administered, during the minority of my children, I do hereby appoint my dear wife, Anne, my sole executrix, and I do bequeath and devise the same, both real, and personal, to her, in trust, with full powers to sell, either at public, or private sale, all, or any part thereof, and the proceeds to re-invest, and re-sell, at her discretion, for the purpose of paying my debts, and legacies, or for a more advantageous investment ; and good and sufficient deeds and conveyances to make therefor. It being my intention, and will, that my estate shall be kept together, and held in common, for her benefit, and that of my children, until they shall become of age respectively ; at which time, and as soon after, as any one of them comes of age, he, or she, is to receive their proportion, it being always understood, that my wife is to receive an equal proportion of my estate, she, and they, having share, and share alike." *Held*, that this was a devise in trust to the devisee, of all the estate, real, and personal, in her individual character, and not as executrix: and that her refusal to qualify as such, did not affect the trust.

5. The office of the codicil, is to explain, add to, or subtract from the will ; the will, and codicils, if there are more than one, constitute but one instrument.

6. Where a devisee in trust, to sell and dispose of the real estate of the testator, upon the consideration of the payment by a mortgagee of the testator, of a sum of money, by deed, " acknowledged, remised, and forever quit claimed, all the estate, right, title, interest, use, trust, property, claim, and demand whatsoever, at law, as well as in equity, in possession, as well as in expectancy, all and singular, &c." describing the mortgaged property, which conveyance was made to the mortgagee : *Held*, that this was a conveyance of the equity of redemption, being made after the mortgage was forfeited.

7. A sale made of land by a devisee in trust, is not vacated, by the estate of the testator being afterwards declared insolvent, though the administrator might be entitled to the proceeds, for the purpose of distribution among the creditors.

388    ALABAMA.

Heirs and Adm'r of Hitchcock v. The United States Bank of Pennsylvania.

8. Although a mortgagee may have purchased in the equity of redemption, he has the right to apply to a Court of Chancery for a foreclosure, and to quiet his title, as a Court of Chancery always looks with suspicion, upon such transactions.   To such a bill, the administrator, if the estate has been declared insolvent, is a necessary party, to enable him to show, if he can, that the equity of redemption, has been purchased at too low a rate, or a fraud in the sale.

9. In such a case, if there is no suggestion that the mortgaged property will sell for more than the mortgage debt, the complainant may take a decree for a strict foreclosure.

10. It is no objection that a trustee and his *cestui que trust* unite in the same bill : therefore, where trustees filed a bill without disclosing the beneficiary, and afterwards a supplemental bill, disclosing the 'fact that they were trustees for the United States Bank of Pennsylvania, and praying that it be made a party complainant to the bill ; and also an amended supplemental bill, disclosing that the Bank had gone into liquidation, and that certain persons were assignees of the Bank, and praying also that they may be made parties complainant : *Held*, that all these persons constitute in law but one, representing the interest of the Bank.

Error to the Chancery Court of Mobile.

THE original bill in this cause, was filed by Joseph Cowperthwaite, Thomas Dunlap, and Herman Cope, to foreclose a mortgage executed by Henry Hitchcock, upon certain lands in Mobile, to secure the payment of a debt due them of six hundred and twenty thousand, five hundred and thirty dollars, ninety-six cents, with interest at the rate of eight per cent. per annum, from the 1st March, 1838.   That Hitchcock has departed this life, and devised all his estate, real and personal, to his wife, Anne Hitchcock.   That by a deed made on the ―― day of ――――, 1840, she remised, and released, to the complainants all her legal and equitable title to the mortgaged premises, and put them in peaceable possession thereof.   That Isaac H. Erwin, has been appointed administrator of the estate of H. Hitchcock, and has, or may pretend to have, some right to redeem the said mortgage.   The prayer of the bill is, that he be made a party to the bill, that unless the mortgage debt be paid, the mortgage be foreclosed, &c.

At a subsequent term leave was given to make new parties, and to amend generally, and the complainants filed a supplemental, and amended bill, in which, after reciting the original bill, they state, that they are trustees for the president, directors, and company of the Bank of the United States, and pray that

the said president, directors and company, may be made complainants jointly with them. That the original bill was filed amicably, with an express agreement between complainants and the agent of Anne Hitchcock, that they should, under a decree of the Court, be put in peaceable, and quiet possession of the mortgaged premises. That during the life time of H. Hitchcock, and after the forfeiture of the bond, and mortgage, a bill was filed by them to foreclose it, to which he filed the plea of usury. That whilst the bill was pending, and the plea undecided, and whilst Hitchcock was engaged in a negotiation with them for the payment of the debt by a transfer of real estate, he died, making his wife, Anne Hitchcock, his executrix, with power to pay his debts, by a public, or private sale, of his real or personal estate.

That the mortgaged property was almost without exception, improved, and the rents estimated at about fifty thousand dollars per annum. That to obtain possession of the property, and avoid the delay attending the litigation of the plea of usury, Herman Cope, one of the complainants, and as the agent of the Bank, came to Mobile, for the purpose of negotiating with the representatives of Hitchcock for the possession. That he had many interviews with one James Erwin, the brother of Mrs. Hitchcock, on the subject of such settlement, he representing himself as her agent, and fully authorized to make such arrangement. That said Erwin represented, that the estate was largely insolvent, and that there were creditors to a great amount, wholly unprovided for. That these claims could be all paid, by the sum of one hundred and fifty thousand dollars. That upon the payment of that sum of money, for these purposes, the Bank should enter into the premises by a conveyance from the devisee, and should enjoy the same without let or hinderance from the representatives of H. Hitchcock. That the bill filed by the Bank against H. Hitchcock should be abated. That the devisee should decline to take upon herself the execution of the will, but that a friendly administrator should be appointed, who would acquiesce in the final adjustment.

That confiding in these representations, he paid into the hands of James Erwin, the said sum of one hundred and fifty thousand dollars, to be applied by him to the payment of the

390 ALABAMA.

Heirs and Adm'r of Hitchcock v. The United States Bank of Pennsylvania.

unsecured debts of H. Hitchcock, and the devisee, by deed of release, conveyed to complainants all her legal and equitable estate in the premises; and received from them, a release of all demands against said Hitchcock's estate; and supposing themselves in virtue thereof in possession of the premises, they filed the original bill.

That James Erwin, some time before the negotiation between him and complainant Cope, had purchased at sheriff's sale, under an execution, as the property of H. Hitchcock, eight stores, (included in the mortgage) at fifty dollars, and took the sheriff's deed therefor—that said stores are estimated in the mortgage deed at two hundred thousand dollars, and as security for that sum, were accepted by the complainant—that after the said agreement was concluded on, and the money paid, said Erwin agreed to give complainants, as one of the means of quiet enjoyment, and possession, of the premises, whatever title he had acquired by his purchase—that said Erwin desired the terms of the negotiation to be concealed, that he might be able the better to arrange the payment of the debts of H. Hitchcock.

That Isaac H. Erwin was appointed administrator of H. Hitchcock, and instead of carrying the agreement into effect, has in every way endeavored to thwart it, by leasing out the premises, and by publicly advertising that complainants were not in possession of the premises, &c. The bill also makes Anne Hitchcock, and her children, the heirs of H. Hitchcock, parties to the bill. On motion, and upon affidavit, the Court granted an injunction restraining Isaac. H. Erwin, administrator, from intermeddling with the mortgaged premises, or the rents thereof, and also appointed a receiver.

The complainants filed a second supplemental and amended bill, repeating the charges more specifically—charging also, that Isaac H. Erwin acquiesced in the agreement, made with his brother, as agent of Mrs. H., but delayed the execution of it under various pretences, and finally made another demand of the Bank as the price of his acquiescence, &c. That the original debt due from H. Hitchcock was $520,530 96-100, and that the further sum of $100,000, was by the Bank advanced to said Hitchcock, to be by him expended in improvements upon the mortgaged property, under the direction of an agent of the Bank, and that it was so expended.

That since the filing of their bill, they have conveyed all their interest in the aforesaid mortgaged premises, to James Dundas, Mordecai D. Lewis, Samuel W. Jones, Robert L. Pitfield, and Robert Howell, and pray that they may be taken and considered as joint complainants, &c.

To this bill, Isaac H. Erwin, administrator, with the will annexed of H. Hitchcock, demurred.

Mrs. Hitchcock, by her answer, denies any personal knowledge of the indebtedness of her husband, to the Bank, but adopts the answer of her husband to the bill filed against him, as containing a true statement of the facts. She admits the execution of the mortgage to the Bank, and that she joined therein, but whether she thereby released her dower, or not, does not know.

She admits, that under the belief, that as devisee in trust she had the right to do so, she executed to the complainants the deed referred to in the bill. The sole consideration of said sale, or release, was the indebtedness, or supposed indebtedness, of her husband's estate, she received no money from the complainants, but supposed it was a compromise. That within the time prescribed by law, she renounced all benefit under the will, and elected to take such interest as she was entitled to by law—that in relation to the $150,000 paid James Erwin, she does not know what understanding existed, between him and complainants, except that Erwin informed her, he received it in payment for eight store houses. No part of the money ever came to her hands, to appropriate to her own use, or to the payment of her husband's debts.

Isaac H. Erwin also answered the bill, and insists by his answer, that the original bond and mortgage were void. That as Mrs. Hitchcock had not qualified as executrix, she had no interest to convey by the deed. That as she had a mere naked legal right, her sale passed no interest. That said sale was invalid, because the proceeds of the sale, were not appropriated in payment of debts.

The bill was also answered by the guardian *ad litem* of the infants.

The record, consisting of upwards of five hundred large folio pages, contains a vast amount of testimony and documentary evidence, which it is impossible to make even an ab-

stract of; such of it as is important to a proper understanding of the case, will be found embodied in the opinion of the Court.

The Chancellor gave an elaborate opinion upon the case, in which he attained the conclusion—that the Bank had power to make the contract of loan with Mr. Hitchcock, in this State —that the contract was made in this State, and that the bond, and mortgage, were valid—that Mrs. Hitchcock, as devisee, had power to convey the lands, and that her conveyance, pursuant to the agreement made with the agent of the Bank, by her agent, James Erwin, was binding on her, and the heirs, and personal representatives of Hitchcock ; and that therefore, the Bank, might have either a strict foreclosure, or sale of the premises at its election.   The complainants elected to take a strict foreclosure.

From this decree the defendants prosecute this writ, and assign for error :

1. The misjoinder of parties.

2. The omission of necessary parties.

3. The supplemental bill was not authorized by the leave to amend.

4. The original and supplemental bills do not contain matter of equity jurisdiction.

5. In overruling the demurrers to the bill.

6. In admitting the Bank of the United States a party, when not made so by the second bill.

7. In appointing a receiver.

8. In bringing the infant heirs before the Court, by order of publication.

9. In examining H. Cope, one of the complainants, as a witness.

10. In ordering to attorn the receiver.

11. In granting the injunction against I. H. Erwin.

12. In refusing to modify it.

13. In not dismissing the bill on demurrer.

14. In the decree rendered.

STEWART, for plaintiffs in error.   The plaintiffs rely on the following propositions to defeat the bill of the complainants:

1. The bill is defective in respect to the complainants.   It

is uncertain who the complainants are, and this uncertainty is fatal. Are Cowperthwaite, Dunlap and Cope, parties, complainants or not? It can be shown from the bill that they are, and it can be shown that they are not.

The allegations are several, and not joint. Some are made by one party, and some by another; this cannot be done on a joint bill.

Parties are retained before the Court as complainants, jointly with others who have no interest.

There is a change of parties complainants; those who filed the bill are out of it, and others substituted.

A title acquired after suit brought is relied on.

The bill presents an alternative right, in one or the other complainants; this cannot be sustained.

As to the uncertainty of complainants, and joining them, and transfer of right pending suit, 2 Paige, 450; 1 Hopkins, 555; 4 Russell, 242, 244, 225; 3 Cond. Eng. Ch. Rep. 651-2, 643; Edwards on Parties, 14, 229; 2 Maddox Ch. Rep. 466; 1 Atkyns, 291; 2 J. Ch. Rep. 245; 1 Marshall, 594; 2 Dickens, 707; Story's Eq. Pl. 155 to 163, 147 to 153.

2. There is no equity jurisdiction shown by the bill, and it is bad on demurrer.

If the allegations of the bill are true, the complainants have the fee simple title, and the remedy is by ejectment.

The bill shows a void contract, and which no court of law or equity could enforce.

The bill shows a fraudulent combination against the heirs and creditors, administrators and legatees, and is in fraud of the laws of descent, distribution and rights of creditors.

So far as the mortgage is concerned, the bill shows a severance of the debt from the title to the land, the land being conveyed to Dundas, but the bond not being assigned.

The bill shows a title obtained from Mrs. Hitchcock, by a breach of the trust by her, and being claimed under a breach of the trust it is void.

The title of the complainants is shewn, by the bill, to be a void one.

The bill is not sustainable, as a bill to foreclose, because it does not show a case in which there is a right to redeem. It is not allowable to offer, gratuitously, the privilege of redeeming,

where the right does not exist, and make such an offer the foundation of a right to file a bill to foreclose, else a party could always, in every case of a contested right, file a bill, offer to his adversary the privilege to redeem, where the price was of equal value with the land, and thereby, on a failure to redeem, obtain a decree against his adversary, barring all title, and cut off the adverse title of infants, &c.

The bill cannot be sustained on the ground of quieting title; the title has never been tried at law. If this case could sustain such a bill, any case could, where there was a contested title.

Nor is it sustainable on the ground of restraining waste; no such case is made.

Nor is the pretext to restrain multiplicity of suits better maintained.

3. The bill shows no cause of action against Mrs. Hitchcock, and she is improperly made a defendant. She has violated no contract made by her.

Her contract, so far as she has made any, is executed, and all the rights which such contract secures, are enjoyed by the complainants, and she has not disturbed them in any manner. Why then file a bill and seek a decree against her?

Mrs. Hitchcock is no party to any disturbance made by Isaac H. Erwin, and has no connection with his acts.

The right of dower of Mrs. Hitchcock, is not put in issue by the bill, nor is it sought to be subjected, and it cannot be sought to be barred by surprise, and by claiming it after decree, as barred by the decree, when no allegation in the bill is made on the subject.

4. The bill cannot be sustained against the heirs of Henry Hitchcock.

They are no parties to the disturbance of Isaac H. Erwin, and that cannot be made the pretext of a bill to bar their rights.

They cannot be barred of their adverse title, by a bill, with a voluntary offer to allow them to redeem, when it is not admitted that they have a right to redeem.

Their title to land cannot be litigated, on a bill to foreclose, which denies their right to foreclose. The bill shows a fraud as against them.

Their adverse title cannot be tried on a bill, nor barred, nor defeated. They have a right to try it at law. [6 Paige, 637.]

Equity has not jurisdiction to try adverse legal titles on a bill, and cannot, on a bill to foreclose, forestall adverse titles.

5. The contract made in Philadelphia, between the Bank and Henry Hitchcock, and which provided for the execution of the bond and mortgage, was one unauthorized by the charter of the Bank, and was void.

This contract was made in Philadelphia, and is within all the prohibitions of the charter. It secures more than six per cent. interest, and this is contrary to the express restriction of the charter. And it is contrary to the usury laws of Pennsylvania.

Though the general usury law of Pennsylvania merely affixes a penalty for the taking of usurious interest, a corporation cannot say it will violate the law, and incur the penalty, because the corporation is the creature of law, and it has no creation for the purpose of violating laws; in such case its contracts are void, for want of power to contract—not like the case of individuals.

The contract derives no aid from the circumstance that the money is stipulated to be paid in New York, because the law of New York, which is the place of payment, prohibits such a contract, and makes it void.

It derives no aid from the circumstance, that lands in Alabama were to be mortgaged; that is but a cumulative security. Nor because a bond was to be made in Alabama, because that bond was to be a void bond, payable in New York, where, by law, it was made void.

Nor can the contract be maintained because the debt was originally due in Alabama, even if that were true, because the contract is made in Philadelphia. But in point of fact, one half of the debt was due and payable in New York. And large sums were due in Philadelphia. It is not said where they were due, and the presumption is, they were due in Philadelphia, as they are there stipulated for, and nothing said to the contrary.

The stipulation for the loan of money, to be laid out in improving real estate, in Alabama, is not warranted by the charter.

A corporation cannot, by a contract, violate its charter, because it cannot make a void contract; not because the contract is void, but because no contract is made, as it can make only lawful ones. And when an illegal contract is attempted, for the want of power in the corporation to make it, it fails, and no right whatever is created; and the good cannot be separated from the bad, and there can be no such thing as a contract, which shall stand, though a penalty be incurred.

As to the powers of a corporation—Angell on Corporations; 8 Ohio Reports; 9, Mass. Rep. 52; 4 Ala. Rep. 558; 13 Peters' Rep. 587; 1 Hall's N. York Rep. 480, 555-7; 2 Randolph, 109; 2 Peters, 527; 7 Wendell, 31; 4 Wheat. 518; 2 Cranch, 127; 4 Peters, 152; 1 Stewart, 299; 14 Peters, 129; 4 Peters, 168.

6. The bond and mortgage made in Alabama, are void. They were made in pursuance of, and to carry out, a contract which was void, unauthorized by the charter, and in violation of a statute, and being made to carry out an illegal contract, they are void also.

They are expressly made payable in New York; the law of New York governs their validity, and they are void, because they violate the usury laws of New York, which declares them void in toto.

They are made by Hitchcock, in favor of a party claiming the right to contract under a foreign statute, contrary to the laws and policy of Alabama, and she is not bound to enforce them.

Alabama, under the laws of comity, and, indeed, in every case, has the power to construe the charter for herself, and is not bound by the construction of any other State, and will not give force to a mere implication, the result of which would be, that the corporation would have more power abroad than at home.

The restrictions imposed on the Bank at home, will be equally held as restrictions on her powers in Alabama, and she must be restricted to six per cent by her charter. Besides, the law of Alabama, in relation to Banks, restricts even the Alabama Banks to six per cent. interest.

Though the statute of Alabama does not, by its very letter, bring the United States Bank positively within its terms, so as

to restrain it by positive statute from taking eight per cent. in Alabama, still it is sufficient to indicate what is the policy of Alabama, so as to govern its comity in this respect.

The transaction is a *loan* in substance, and secures a profit for the use of money. The loan is not like a mere forbearance, which can terminate the period of the running of the interest, by payment, at any time. It is a contract which secures the rate for a fixed period, and the rate is positively secured.

Where a contract violates a statute it is void—5 Barn. & Ald. 335; 7 Com. Law, 121; 17 Com. Law, 255, 256; 12 Ib. 222; Chitty on Contracts, 228, 217, 231, 232; 4 Halstead, 352; 5 Ib. 87; 2 N. Hampshire, 517; 3 Halstead, 54; 1 Taunton, 136; 14 Mass. 322; 17 Ib. 281; 8 Cowen, 20; Holt's N. P. Ca. 435; 3 Starkie, 61; 11 East. 300; 1 Brod. & Bingh. 447; 2 Term, 610; 2 Bos. & Pul. 130, 374; 3 Vesey, 612; Bulstr. 38; Hobart, 72; Dyer, 356; Park on Insurance, 232; 3 Bos. & Pul. 35; 1 Ib. 272, 264, 340; 6 Term, 723.

Any prohibition is sufficient, and it makes no difference whether it be by penalty or not—Chitty on Contracts, 232; 17 Mass. Rep. 281; 7 Wendell, 280; 2 Peters, 527; 1 Maule & Selwyn, 597; 14 Johns. 273; 20 Johns. 397; 7 Com. Law Rep. 121; 17 Ib. 355; 12 Ib. 222.

The plea of performance governs the contract as to its validity and construction—Story's Confl. Laws, § 280, 287, 292, 293, 296, 304; 2 Kent's Com. 460, 461; 9 Porter, 10; 13 Peters, 65; Minor's Rep. 388, 14 Peters, 129; 4 Porter, 128; 20 Johns. 202; 17 Ib. 519; 10 Wheaton, 383; 6 Peters, 172, 202; 7 Peters, 435; 2 Johns. Ch. Rep. 355.

7. The Philadelphia contract, and the bond and mortgage made in pursuance thereof, are all payable in New York, and void by the laws of New York, which govern the whole contract.

The New York interest law, avoids all contracts for more than seven per cent.

By the laws of New York, the principal as well as the interest is forfeited.

The debt governs the mortgage, as to its validity, because the debt is the principal, and the mortgage is the incident.

The legal policy of Alabama is to restrict *Banks* to six per

cent. interest—Const. Ala.; Clay's Dig. 284; 1 Stewart, 299; Clay's Dig. 590, § 4, makes all usurious bonds void.

An usurious security, and every thing which is a furtherance of it, is void—2 Peters, 527; 9 Mass. 49; 1 Hall's N. Y. Rep. 546-7, 553; 8 Term Rep. 390; 20 Johns. 285; 10 Ib. 195; 3 Term Rep. 537; 2 Starkie's Rep. 211; 6 Cranch, 199; 6 Wheaton, 593; 2 Randolph, 465; 19 Johns. 1; 1 Wendell, 56; 2 Cowen, 678, 712; 3 Wendell, 574, 582; 10 Wheat. 367.

There is no distinction between lending and discounting— 5 Law Library, 59; Comyn on Usury, 156; 1 Hall's N. Y. Rep. 556-7; 6 Cowen, 294; 2 Peters, 533, 537, 538.

As to the hazard of the debt—5 Com. Law Rep. 15; Comyn on Usury, 39.

8. The loan of the money to improve the real estate creates no lien on the property. The corporation has no authority to do so by its charter.

The loan was under a special contract, which was usurious, and it must rest on that contract, and cannot be separated from it.

It was in violation of a statute law, the law of the charter, and a violation of a statute law places it on ground different from the violation of the common law, it makes all void.

A contract is an entire thing, and cannot be separated. This was connected with other matters of unlawful stipulation.

The bill is not framed so as to assert such lien, if it did exist. Nor are the proper parties here to try it. Those who did the work, and were not paid, would be preferred, and they are not made parties.

9. The contract being void, it cannot be purged by restoring part of the money, and if it could, the money is not restored to the proper party.

Though a new contract, free of usury, would be valid, it must be a new one, and all the old securities or contracts must be cancelled and destroyed.

If it could, the money must be paid to the proper party, *bona fide*, and not fraudulently paid to a third person. And such new contract must be made with a party who has authority to make such new contract.

If the contract be void in part, it is void for the whole—1 Com. Law Rep. 264; 1 Hall's N. Y. Rep. 553; 5 Taunton,

780; 8 Johns. 197; 20 Johns. 285; 8 Term, 390; 9 Mass. 55; Cro. Jac. 508; 1 Term. 201; 4 Campbell, 157.

That the contract is void, though not so expressly declared by statute—2 Peters, 527; 8 Ohio; 13 Connecticut Rep.; 17 Mass. 281, and authorities cited.

10. Taking the deed to Cowperthwaite, Dunlap & Cope, does not help the Bank. It was a device merely, and the Bank cannot do indirectly what it cannot do directly. [2 Cowen, 711.]

11. If the mortgage was good it cannot be foreclosed, because it is merged in the title now held by the *complainant*, and the debt is *extinguished*, and it can no longer be considered as a mortgage to be foreclosed.

By the contract with Mrs. Hitchcock, the bond debt, and all the bills and notes on which it was founded, were surrendered to her, on the 10th February, 1840, in consideration of delivery of possession by her.

The land is conveyed by Cope, &c. to Dundas, in fee simple. But the debt, or bond, is not *assigned* to them, *and could not be*, because it was previously released and cancelled. There is, then, no pretence that Dundas, &c., have a title which can be foreclosed as a mortgage. They have a fee simple, or no title, and the redress is at law.

Banks are bound by the statutes against usury—3 Peters, 42, 36; 9 Mass. 49; 9 Peters, Waggoner v. B'k U. S.; 5 Randolph, Stribly v. Bank of Valley; 11 Wheat, 412; 15 Johns. 358, 381; 13 Conn. 249; 12 Peters, 135; 2 Hill, 267. And the policy of the law is to watch them narrowly, 2 Cowen, 755.

Release of the debt is a release of the mortgage—1 Powell on Mortg. 144, 145, note 1. And where the debt and mortgage are separated, the mortgage becomes void. Powell on Mortgages.

Taking a mortgage in another State does not change the contract. The debt is the principal, and the mortgage is but the security and incident—Story Confl. Laws, 287; 10 Wheat. 367; 2 Vernon, 395; 2 Atkyns, 382; 2 Kent's Com. 460.

The residence of parties is never taken into view, in construing contracts, either in England or America—Story's Confl. Laws, § 279; 3 Conn. Rep. 253; 2 Har. & Johns. 193, 228.

12. The will of H. Hitchcock, gives a power merely, but does not devise.

The will which devised, was made long before the testator's death, and such a will does not pass after acquired lands.

The codicil last made, *reduced* the authority to a power merely, and extended the power to after acquired lands.

The codicil controls the will and destroys the devise, and qualifies it so as to leave a power merely.

It is not shown that these lands were acquired by Hitchcock before the date of the *will;* this is not charged in the bill, nor proved, therefore it does not appear they are *devised lands;* and there is no showing of title in Henry Hitchcock, before the making of the mortgage.

13. The devise to Mrs. Hitchcock was made to her as executrix, and is connected with her administration of the estate, and she takes as executrix, and not as trustee. Without qualifying, the trust does not operate. Her renunciation of the office defeats her title, *ab initio.*

A codicil controls the will, and after acquired lands don't pass by a will. The fourth codicil reduces the devise to Anne H. to a *power*—Butler v. Leavens, 8 Porter.

The devise attached to the office of executrix, and not to Mrs. H., independent of the office of executrix—1 Lomax on Ex. 364, 361; 11 East, 288.

In England, executors can act before probate, and his acts are valid; not so here—he must give bond. The title of the devisee in England, does not require probate, as to land. It is held by the *will* alone, which can be proved on an ejectment, as a deed or title. Not so here. Probate is necessary to a will of lands, and County Court has jurisdiction as to probate of lands. 1 Lomax on Ex., 82, 83, 86, 87; 4 Munford, 200.

Renunciation of devise avoids it, and puts the heir in possession, by descent, by relation back to time of death—1 Lomax on Ex. 361, 362, 83; 14 Vesey, 434; 3 Lomax 117, No. 21.

All devises are void as against creditors, and against the administrator, when the personals are exhausted, whether it be a devise, a trust, or any other. All must yield to the title of the administrator, like bequests in England, because placed on the same footing—Clay's Dig. 191, § 1, lands charged by law; 192, § 2, where estate insolvent; 224, § 16, § 20, Petition for sale; 220, §§ 1, 2, 3, bond required; 226, § 27; 197, § 27; 199, § 2; 598, § 14.

JANUARY TERM, 1845. 401

Heirs and Adm'r of Hitchcock v. The United States Bank of Pennsylvania.

14. If Mrs. Hitchcock was a devisee under the will, it was a devise in trust, and for all the creditors and legatees.

The terms of the devise are, that after the payment of all just debts, she shall pay legacies out of the proceeds.

Just debts only were to be paid, and afterwards legacies.

Usurious debts are not just debts, and cannot be recovered against the rights of the heirs and legatees.

Even among just debts, no one could claim precedence over others.

15. The devise is defeated by the appointment of an administrator, the insolvency of the estate, and petition for order of sale of lands.

Lands are here legal assets, as well as personal property, after the personal property is exhausted. The law subjects them, independently of the will of the testator. And the right of the administrator over them, is paramount to the will of the testator, the law compels their application to pay debts.

No devisee can acquire a title without the consent of the administrator; like chattels real, lands are assets when necessary, and are put on the same footing by our laws.

The title of the devisee, like that of the heir, is divested by relation back from the date of the decease, when required to pay debts, and all intermediate conveyances, by the heir or devisee, are avoided.

There cannot be two representatives of the deceased, with power to recognize or pay debts, because no such thing exists in this State, as equitable assets. The whole estate must be settled in the Orphans' Court, by the administrator, and that Court has jurisdiction of the whole assets.

An administrator could not, by our law and decisions, sell the land, and pay the mortgage debt. He must sell the land subject to the incumbrance.

From the moment the administrator petitions the Orphans' Court for the sale of lands, his right springs into active existence, and the title of heirs and devisees must yield.

Devises are void when they contravene the policy of the law, and fail when they become unlawful. Powell on Devises, 426, 434, 443, 471; Sugden on Powers, 106.

As to the power of executors—1 Lomax Ex. 82, 219, 220, No. 5; 3 Stewart, 489; 2 Porter, 33; 3 Porter, 221; Sugden

on Powers, 106 ; 8 Porter, 394; 1 Ohio, 101; 1 Yeates, 422; 3 Lomax Dig. 272 to 276, 278 ; 3 Leigh, 12 ; Powell on Devises, 426, 434, 471.

An executor with power to sell cannot exchange. 1 Ohio Rep. 104.

In Alabama, an executor has no power before probate—3 Stewart, 489 ; 1 Lomax, 83 ; 4 Munford, 194.

An executor or administrator can make no contract to bind the heirs—2 Porter, 33; 3 Porter, 221.

The heir may resist the sale for the payment of unlawful debts—2 Ala. Rep. 660. May shew debt barred.

16. The deed made by Mrs. Hitchcock to the Bank was a breach of the trust, created by the devise. Because it was a void debt which was paid. Because one single debt was paid, to the defeat of all others. Because a right worth at least $150,000 was released, without any benefit to the estate, but by placing the funds in the hands of a stranger, from whom the heirs, legatees and creditors have no security. Because it was an attempt to conceal that fund, so that it could not be reached, and the Bank lent its aid to this purpose. Because that sum was not the full value of the equity of redemption. Because the will gave the power to *sell,* but not to release and abandon, and the power must be strictly pursued. Because it was expressly agreed Mrs. Hitchcock should not qualify.

The party receiving the deed had full notice of all this illegality, and even if they had not, it would not be material. A party dealing with a trustee, must look to the power, and must even see to the application of the purchase money.

That the deed from Mrs. H. is a breach of trust, see authorities in the printed brief of Mr. Yerger.

As to disposing of the money in the hands of the receiver— 1 Ala. Rep. 109.

17. The agreement, as set out in the bill and proof, and relied on, was void, as against the administrator, the heirs, and Mrs. Hitchcock, for fraud.

Mrs. Hitchcock received nothing, and there is no proof that she knew that any money passed.

Mrs. Hitchcock is in no manner connected with the contract made with James Erwin.

The complainants are estopped from saying they contracted

with her, or that they paid her the $150,000, because the contracts are exhibited by *three deeds*, and they are conclusive of the facts.

*The deed* signed by Mrs. Hitchcock, recites the consideration for it, as being, the sum of $773,452 23, which is the amount of the bond, the interest on it, and incumbrances on the land paid off. But excludes the sum of $150,000.

*The deed* of release, or receipt given by the *Bank*, where the Bank debt is surrendered, recites the delivery of possession of the property to the Bank, *excepting*, expressly, the eight stores, which are recited as in the possession of James Erwin.

*The deed* of the eight stores, from Erwin, recites $150,000 as the price of the sale of Erwin's rights, to the Bank, for those eight stores. Even according to their own account, they were paying, in full, James Erwin's debt, and concealing the fact, and the fund, from the other creditors and heirs.

Isaac H. Erwin was no party to that agreement, and knew nothing of it, and when informed of it, he offered to resign, but would not execute it. It would have been a violation of his duty to do so.

The heirs are not bound by that agreement, they receive no benefit, because the application of the money paid was not secured to be applied to the payment of debts, but was misapplied.

The arrangement for a friendly administrator, a friendly decree, and a friendly concealment of the facts, was a gross fraud, attempted to be used by the Bank to secure them a benefit, and no party to this record was a party to that fraud, except the complainants.

Chancery cannot be made use of to conceal frauds, and secure collusive agreements, nor can a Court be forestalled with impunity.

18. The dower right of Mrs. Hitchcock must be protected, and it must be so declared, to prevent surprise, even were the title of the complainants available.

The bill does not seek to condemn the dower right of Mrs. Hitchcock, it is not put in issue, and cannot be condemned by implication.

Dower is favored by the law, and never treated lightly, and never destroyed or impaired, except by express acts.

The making of Mrs. Hitchcock a party, was improper and unnecessary, and if to litigate her right of dower, is improper. The bill contains no averments putting it in issue, and no surprise will be permitted. Any decree on this bill, in any event, must be "*without prejudice*" to Mrs. Hitchcock's individual rights.

19. Mrs. Hitchcock is not divested of her dower in the land in controversy.

Her joining in the deed of mortgage was before the passage of the statute on that subject, and the effect of that deed, as to her, stood as at common law.

At common law, dower would not pass by the deed of the wife, she being a *feme covert*, and dower being an estate not in existence during the life time of the husband.

A dower right cannot be conveyed by joining in a deed made by the husband. There must be appropriate words in the deed to pass the dower right. It did not, therefore, pass by the deed.

The release of dower on the back of the deed, did not pass the dower, because there was no acknowledgment of that release, such as the statute required; the *acknowledgment* is of the *mortgage* deed, *jointly* made, by the husband and wife; but is *not of the release of dower*.

The deed of release made by Mrs. Hitchcock to the Bank, was in her fiduciary capacity, as a devisee of Hitchcock, and expressly made under the powers under the will. It purported, and was intended, to pass the right of the testator, and not her individual right.

The deed cannot be construed as her release of individual right by implication; no dower can be lost by implication.

The deed will be construed by the consideration. There was no personal consideration. The consideration was a release of the debt of the deceased, and was beneficial to the estate, not to her. Her dower was a title superior to that of heirs, legatees or creditors.

The money paid, was not paid to her, nor for her, nor under her control, if it was to pay debts with. Nor was the money paid for her private benefit, and she has no connection with that payment, nor James Erwin's acts, nor the promises of the Bank to James Erwin.

The individual release of Mrs. Hitchcock was not necessary to pay the debt, as the title of the deceased to the lands was, as it appears, of greater value than the debt.

The debt was extinguished with the means of the estate, that would have released the dower, if even it had been originally pledged.

A release of dower, or a mortgage, is not an absolute release; a discharge of the debt restores the dower right.

And a release of the debt, or purchase of the equity of redemption has the effect to restore the dower.

Where the widow relinquishes the provision made for her in the will, within one year after probate, it entitles her to dower. She did so. She had entered into no contract preventing her from so doing, and never received any thing for her dower.

17. The devise having failed of effect, by the non-acceptance of the executorship and renunciation thereof, or of the power to sell lands, the heirs are in by descent; and entitled to all the rents, until a sale, whether mortgaged or sold under order of the Orphans' Court.

18. The decree is improper in itself, even if complainants were entitled to a decree.

The Court cannot render a decree imperfect in itself, or in the alternative, and to become effectual by a declaration of record, to be made by one party in vacation.

The act of a party can never be a decree, or a part of a decree. The Court must pronounce its action upon the act of the party, and declare it to be a sufficient election.

The authority of the counsel to make the election, is not ascertained without an act of the Court. Nor does it appear who made it, nor by what authority it was made.

No absolute foreclosure can be decreed; there are infants concerned, and there must be a reference to ascertain how much is due, and how much, and what, shall be sold, and how sale shall be made.

The rights of infants must be saved; they may redeem when they come of age.

The terms of the mortgage require, that the Bank shall pay the previous incumbrances on the land, and that the first proceeds of sales shall be applied to pay them.

The rent or profits in receivers hands, are not applied in part extinguishment of the mortgage.

The bill is to foreclose a mortgage, and the decree treats it as a bill to try the title to land, and a recovery is had, and damages, or rents, from the day the plaintiff's title accrued.'

No credit is given for funds belonging to the administrator, shown, by the proof, to be in the hands of the Bank.

The decree is confined to all the rights and claims of the complainants, and respects none of those of the defendants; even those admitted by the complainants contracts and proofs. Yet they are infants under the care and guardianship of the Chancellor.

The refunding bond required is too small, and is void, because taken before the decree was made. It is for less penalty, even, than the assets in the receiver's hand, and they are required to be immediately paid to the complainants.

Hopkins, for the plaintiff in error, in addition to other arguments on several points of the case, submitted the following:

The State of Pennsylvania for objects, which she deemed important, granted the charter of the Bank, and conveyed by it such a measure of power as her legislature thought would be sufficient to accomplish them. The Bank had no power, but that, which was granted or might be necessary to carry such power into effect. [Angel & Ames on Cor. 66, 67; 4 Ala. Rep. 558; 13 Peter's Rep. 587.] The section which prohibits the Bank from taking interest at a rate exceeding 6 per cent. per annum upon her loans and discounts in the State of Pennsylvania, contains a grant of authority to take interest at the rate mentioned upon such loans and discounts, and it is the only grant of authority upon the subject in the charter.

If to the power given to deal in bills of exchange, lend money, and discount bills and promissory notes, no express authority had been added to take interest on any of these operations, the Bank would have had no right or capacity to take more than the lawful rate of the State of Pennsylvania. In such a case the source of her authority to take any interest, would be in the grant of power to do the acts, upon which all persons in that State have the right to take interest, and in the

Heirs and Adm'r of Hitchcock v. The United States Bank of Pennsylvania.

necessity to charge the lawful rate to enable her to carry into effect, the powers which were expressly granted by the charter. The implied power to take interest in the case supposed, would be limited to loans and discounts made in Pennsylvania. If the words in the charter limiting the Bank to 6 per cent. per annum on the loans and discounts she might make in Pennsylvania, had been omitted as to that State, the same limitation would be implied. The charter is a law of that State, and like her general law in relation to interest, and every other enactment of her Legislature, is impliedly limited to the territory, for which the State has power to legislate. It is contended for the defendants in error, that the forbearance of a debt is not a loan or discount. If this position be true, the Bank had authority to take or reserve interest at the rate of 6 per cent. per annum for the forbearance of a debt granted in Pennsylvania, because the general law of the State in relation to interest, allows this rate, and the power to take interest according to that law, would be implied in favor of the Bank, as it would be necessary to enable her to carry into effect, the powers, which were expressly granted by the charter. Upon a loan or discount made in Pennsylvania, the Bank had no authority to reserve the rate of interest of Alabama, by making the note or bill payable here. For granting in Pennsylvania a forbearance of a debt, the Bank had no power to reserve interest at a rate exceeding 6 per cent. per annum; if such forbearance be a loan—a higher rate of interest would be a violation of the charter, or if it be treated as something different, a higher rate would be a breach of the law of Pennsylvania against usury. Pennsylvania had the power to give the Bank capacity to act within the limits of that State, and to prescribe the extent of that capacity. If the charter had prohibited the Bank from doing any act beyond the territory of that State, any thing done by her in another State would be void. But although Pennsylvania had no power to authorize the Bank to exercise the power she derived from the charter in any other State, yet the exercise of them would be valid in any other State, the comity of which permitted it. From the power to deal in bills of exchange, and take a specified rate of interest upon loans and discounts made in Pennsylvania, the assent of that State must be implied to the exercise of the

powers granted by the charter wherever comity allows it. The charter does not prescribe the rate of interest which the Bank may take upon the loans and discounts she might make, or reserve upon a forbearance of a debt she might grant in another State. The Bank therefore had no power that was expressly granted, to take interest any where at a higher rate of interest than 6 per cent. per annum. The action of the Bank was intended mainly, to be in Pennsylvania, and no power can be implied in her favor, to be exercised in another State upon the ground, it is necessary to accomplish the objects for which she was established, that could not be exercised in the State which granted the charter; she had no power either express or by implication, to take upon a loan, or discount, or forbearance of a debt in Pennsylvania more than 6 per cent. per annum, and therefore had no power from either source to take a higher rate of interest in such cases any where. The powers, express or implied, granted by the charter, of which the right to take, or reserve interest, is a part, and which the Bank was authorized to exercise in Pennsylvania, and not prohibited from exercising wherever comity would permit, were thought by that State, sufficient for the accomplishment of the objects she had in view in establishing the Bank.

The validity of any act of the Bank in Alabama depends upon the comity of the State. Comity enables a corporation created by another State, to exercise here such of the powers, which were granted by the charter, as do not interfere with the policy or laws of Alabama; but comity does not and cannot make any grant of power to the corporation. If, by her charter, the Bank had no power to take more interest than 6 per cent. per annum, upon a loan, discount, or the forbearance of a debt, the exercise of comity here cannot give such power, or authorize her to take or reserve a higher rate of interest upon a loan made, or a forbearance granted in this State. The power which comity permits to be exercised, is such only as was granted by the State of Pennsylvania, in the charter to the Bank. Comity is nothing more than the recognition of the law of another State, and consequently of the power which the law or charter gave the Bank. [See 13 Peters, 590; Ang. & Ames on Corp. 206; 14 Peters, 122.] But for the existence of comity, no corporation which had not been created by the

Legislature of this State could exercise any power here. If the effect of comity were greater than I have admitted, power could be exercised in Alabama by a corporation, without any legislative grant of such power from this or any other State. Charters can neither be granted, nor amended, by the exercise of comity.

If the exercise of comity could give power to take a rate of interest which the charter did not, the Bank would obtain as many grants of power from comity as there might be States, in which she acted, and a different measure of power in relation to the rate of interest from New York, Alabama and Louisiana. The power in this respect, obtained from each of these three States, would be different and greater than that on the same subject, which was granted by Pennsylvania ; the only State that ever determined it was proper to grant the charter, and what powers ought to be conveyed by it, to accomplish the objects for which the Bank was established by that State. If additional grants of power were the results of the exercise of comity, the powers of a corporation could never be ascertained from its charter. They would depend at any time, both upon the charter, and the laws of every country, where, with the permission of comity, the Bank was acting at such time. If her powers were ascertained from these sources, upon any particular day, the knowledge of them thus acquired would be no barrier against the enlargement of them. She might afterwards do business in some other State, where she could acquire, from the exercise of comity, greater power than she had before.

The measure of power granted by a charter cannot be diminished by the Legislature which granted it, without the consent of the corporation, unless the right to do so were reserved by the act of incorporation. All the corporate power the Bank had, was given and secured to her by a contract. The charter was a contract between Pennsylvania and the stockholders of the Bank, and that State was incompetent to do any act, which would impair any right the charter gave. Although all the corporate power the Bank had was placed by the inviolable character of the contract which conferred it, beyond the reach of the action of the legislature of Pennsylvania, yet the Bank would have no right to take, upon a loan

52

she made in Alabama, interest at the rate of 8 per cent. per annum, after this rate had been reduced by law to 6 per cent. The charter gives no power to take interest at the higher rate which has been mentioned, and Alabama was competent to reduce the rate. The reduced rate would be the same which is specified in the charter, and there would surely be no pretext for claiming a right for the Bank to take 8 per cent. interest on her transactions in this State, upon the ground that while the rate was 8 per cent. she had exercised the power in the name of comity to take it. But if the power to take 8 per cent. here, before the supposed reduction, had belonged to the Bank, it would be as inviolable and as perfectly protected against any alteration, as any other power of the corporation. According to the effect we ascribe to comity, the powers of the Bank would be at all times the same, whether in the enjoyment of the permission from comity to exercise them in all the States, or confined to Pennsylvania, which granted her charter, by legislative prohibitions in each of the other States, against the exercise of her power in any of them. As the charter was a contract with Pennsylvania, the power given by it could not be impaired without the consent of the Bank, but the other States could lawfully suspend or abolish the comity, which allowed her to exercise her powers within their territory. Upon any other principle than the one we maintain, to ascertain the powers the Bank may exercise in this and other States than Pennsylvania, her power, as to the rate of interest, for instance, that she may take, would be different in different States, and might be different in the same State at different times.

As the Bank derived no capacity from her charter to make a contract for more than 6 per cent. interest, the bond in this case, upon which interest at the rate of 8 per cent. per annum was reserved, is void.

An act of the legislature of the Territory of Alabama, which was passed on the 13th of February, 1818, authorized conventional interest at any rate, to which, parties to a contract might agree, and in the absence of a stipulation upon the subject, it prescribed 8 per cent. as the rate. In the act it was provided that nothing contained in it should be so construed, as to make it legal for any Bank to receive more than at the rate of 6

per centum, per annum upon its loans and discounts. [Toulmin's Dig. 143, 144.] By an act of the 17th December, 1819, the authority to take more interest than at the rate of 8 per cent. per annum, was revoked. [Toulmin's Dig. 444.] The prohibition against the receipt, by any Bank, of more interest than at the rate of 6 per cent. per annum, has not been repealed. By the authority of the legislature of Alabama, it was published as one of the laws of the State in 1833, in Aikin's Digest. [See page of the Dig. 226.] By the same authority it was re-published in 1843, as a part of the statute law in Clay's Digest. [See page of the Dig. 284.] At the date of the act of the 13th of February, 1818, The Planters' and Merchants' Bank at Huntsville, and The Tombeckbee Bank, both had charters. The legislature, when that act was passed, believed it was for the public good, therefore made it the law of the country, that *no Bank* should take more interest than at the rate of 6 per cent. per annum, while it was thought to be the best policy, and therefore authorized by statute, that persons who entered into contracts might take any rate of interest, upon which they agreed. The Planters' and Merchants' Bank of Mobile was established by an act of the legislature of Alabama, of the 8th of January, 1836. It went into operation and held the corporate powers which were granted by its charter, till the 13th of February, 1843. During the whole time it exercised its powers, it was prohibited from taking interest at a higher rate than 6 per cent. per annum. [Aik. Dig. second ed. 596; Acts of the General Assembly of Alabama, passed during the session of 1842–43; see pamphlet acts, 70.] While individual parties to contracts were authorized to take, or reserve any rate of interest upon which they agreed, Banks, (of which there were then two in the Alabama Territory,) were limited to 6 per cent. only. How much more mischievous than they were, would have been the consequences of the act of 1818, if the doctrine asserted by the defendants in error be true? A Bank confined by the policy and law of the State, that granted its charter to the same moderate but ample rate of interest to which our own Banks were limited, could, in doing business here, have set the provisions of our statute law in relation to Bank interest at defiance, reserved conventional interest at the rate of 120

per cent. per annum, and required that as well as the principal, to be paid at New York, or at her own door in Philadelphia. The enormous rate I have mentioned was frequently reserved by contracts between individuals, under the act of 1818. A grant of authority to take, or reserve interest, at a rate, at the bare mention of which, Pennsylvania, had she been asked to make it, would have been shocked, could have been acquired here from comity, if the doctrine affirmed for the benefit of the Bank, can be maintained.

The rate of interest which the stock Banks of Alabama had a right to take, has been constantly less since the act of 1818, than individuals have been authorized to accept or reserve. The three Banks which have been mentioned, were all subject, as long as they exercised corporate powers, to the restriction, from which the Bank of the United States claims exemption. Since the existence of the restriction, there has always been some Bank established by the authority of Alabama, subject to it. During the time in which the transactions occurred between Hitchcock and the Bank of the United States, the Planters' and Merchants' Bank of Mobile was bound by the restriction. The Bank of Mobile is subject still to the restriction upon all promissory notes she discounts, having less than six, or more than twelve months to run. Before the act of 1834, she was bound by the restriction in relation to the promissory notes she discounted, without regard to the time they had to run. [Clay's Dig. 130, § 18.]

Comity does not require of Alabama to permit the Bank, which is a party to this suit, or any other foreign Bank, to take a higher rate of interest than her charter authorized, or she would be entitled to in Pennsylvania, and higher also than stock banks of the State, were permitted to take when the Bank of the U. States reserved the interest she claims. The policy of Alabama, in regulating bank interest, and her law prohibiting the taking of more than 6 per cent. per annum, have both been violated by the Bank of the United States. The bond and mortgage in this case, are void, because the statute prohibited the rate of interest reserved in the bond and secured by the mortgage. Although the act neither inflicts a penalty nor declares a contract void, by which interest was reserved in disregard of the prohibition of more than six per

Heirs and Adm'r of Hitchcock v. The United States Bank of Pennsylvania.

cent. per annum, yet such a contract is void, upon general principles.   Against the prohibition, the Bank had no capacity to make a contract in Alabama, for interest, at the rate of eight per cent. per annum.    [2 Peters' Rep. 527; 7 Eng. Com. Law. Rep. 121; 12 Eng. Com. Law. Rep. 222; 17 Eng. Com. Law. Rep. 355; 8 Ohio Rep. 13 Conn. Rep. 258, 280, 289; 17 Mass. Rep. 281; Chitty on Con. 232.]

As there was no capacity in the Bank to make a contract for interest at the rate of eight per cent. the bond is void for the part which relates to the interest, and being void in part, is void for the whole.   [1 Com. Law. Rep. 264; 1 Hall's N. Y. Rep. 553; 5 Taunton, 780.]

The bond and mortgage are void, because they are usurious by the laws of New York, where the bond on its face is payable.

A loan made in Canada, for instance, where the rate of interest is six per cent. per annum, payable in England, where it is five per cent. only, will bear interest at the rate of five per cent. after the maturity of the note or bond, which was made as evidence of the debt.   It would bear the English rate of interest, although the debt should be secured by a mortgage on real estate in Canada, or Louisiana, because it was payable in England.   [20 Johns. Rep. 102; Story's Conflict of Laws, 242, 243, 244, 2d ed., and § 291, 293.]

If the loan made in Canada, be secured by a note payable in England and reserving interest from the date without specifying the rate, the holder of the note will be entitled to interest according to the English rate.

The interest in such a case, as well as the principal, is of the substance of the contract, and the whole contract, as well the part for the interest as that relating to the principal, is payable in England.   The validity and extent of the obligation of each part of the contract must be tested by the law of England. Why is New York interest as damages allowed upon a note not paid when due, made here, and payable at New York, by which no interest, before maturity, was reserved, and none stipulated for afterwards.   Because the whole contract is to be performed in New York, and the consequences of a failure to perform it, ought to be determined according to the law, in reference to which, the parties made their contract.   That they made their

contract in reference to the law of New York, the note in such a case would prove.

If a note made in Alabama, were to reserve interest from the date, without specifying the rate, and make both payable in New York, the fact appearing from the note, that it was payable in that State, would prove that the entire contract was made in reference to the law of New York, and the law of that State should be resorted to, to ascertain the rate, as well as the validity of the reservation of interest.

If the parties to such a note took one step more, and specified the rate of interest which, with the principal, the note required should be paid in New York, there would be as much proof, and of the same kind, as there was in the other two cases, which have been stated, to show the parties made the contract in reference to the laws of New York, and the same legal principle that has been referred to, would require the validity of the rate of interest, which was reserved, and the effect of the reservation upon the whole contract to be determined by the law of New York.

In each of the three cases, which have been stated, there is proof of precisely the same amount and kind, to show that the parties in each case, made their contract in reference to the law of New York, and as in the absence of all other evidence, it must be acknowledged, it would be conclusive to prove that the two first mentioned notes were made in reference to the law of that State, no reason is perceived why it should not be permitted to prove the same fact, in relation to the last note.

If a note made in New York, and payable there, or if legally payable there, because it appointed no place for payment, reserved more than the legal rate of interest of that State, it would be usurious and void. The facts appearing from the note itself, that it was made there and not payable elsewhere, would be proof that it was made in reference to the law of New York, and upon such evidence, it would be held to be a violation of her law against usury, and therefore, illegal and void. As both the principal and interest due upon the bond to the bank, were payable in New York, the proof is as clear and strong as it would be in the last case mentioned, that the parties made the contract in reference to the law of

New York; and the interest being more than is allowed there, the contract is usurious and void. [Story's Conf. Laws, pages, 244, 250, 352, § 293, 294, 301, b. 301, d. 304, f.; 13 Peters' 67, 77, 78.] A promise in a note to pay interest from the date of it, at a specified rate, is an obligation, if one at all, to pay the same rate till the principal may be paid, or the contract merged in a judgment. If the principal, and a specified rate of interest be payable in New York, it must be determined accordingly to her laws, what is the effect of such a rate of interest upon the contract, and whether the rate specified can be legally required after the maturity of the note, and for a failure to perform what was contracted to be done in that State. Upon a note made here and payable here, in which a rate of interest was fixed and made to accrue from the date, interest according to the specified rate, could be recovered after a failure to pay down to the time of judgment. The recovery of interest would not be of the specified rate, in virtue of the contract until default of payment, and afterwards *ex mora*, till the judgment should be rendered, as if there were no contract to regulate the rate of interest from the maturity of the note till it was merged in a judgment; but all the interest that had accrued before the judgment, would be recovered in virtue of the contract, and according to the rate specified in it. That the rate which would be recovered in such a case, after the maturity of the contract, and till judgment upon it would not be "*ex mora*," is proved by this, that if the rate fixed were five per cent., five per cent. only till judgment would be recovered. But if a contract specified no rate of interest, the rate allowed upon one made and to be performed here, after maturity, and as damages for non performance, is eight per cent. The interest specified by the bond in this case is eight per cent. per annum. If it can be recovered at all, it must be recovered at this rate, from the time appointed by the parties for it to accrue, till a judgment or decree shall be rendered upon the bond. A judgment or decree for interest according to this rate, would be for more than the New York laws, against usury, allow. [20 Johns. Rep. 102.]

A note made in Alabama, and payable in Louisiana, might be valid, although it reserved from its date interest at the rate of ten per cent. per annum, (which is the highest Louisiana

rate,) till payment.    In the absence of all other evidence than the note, it would be sufficient proof that the parties made it in reference to the laws of Louisiana, and upon such proof the note would be judged valid, because it would be shewn it was made according to the laws of that State.    [Story's Confl. Law, 246, § 296.]    The doctrine, that if both the law of the actual place of contract and of performance, be not violated, the contract is valid is modern, and has found as yet but few advocates, either upon the judgment seat or elsewhere.    It seems to have no other foundation than the interest of creditors.    If one were to become a creditor by a written contract, made in this State, by which his debtors acknowledged themselves to be indebted to the payee in the sum of ten thousand dollars, seven thousand dollars of which they promised, in the contract, to pay in New York, upon an appointed day, with interest at the rate of eight per cent. per annum, from the date of the contract, and the other three thousand, with interest from the same time, at the rate of ten per cent. per annum, was payable in Louisiana; if he secured the whole of the debt by a mortgage upon real estate in Alabama, and after default in payment, sued one of the debtors for both sums, and the interest, who should file a plea of usury, alledging that the contract was made in this State, and therefore the reservation of interest at the rate of ten per cent. per annum, upon the sum of three thousand dollars, was a violation of the laws of Alabama against usury, and the interest upon both sums usurious, as there was but one contract, which was corrupt in part, and void therefore, for all the interest; the creditor would be entitled to a verdict, upon an issue on the plea, if there were no other evidence than the written contract.    The contract would be sufficient proof that the parties made the contract for the three thousand dollars and ten per cent. interest, in reference to the laws of Louisiana, where this part of the contract was to be performed, and where the interest at the rate of ten per cent. per annum, is lawful; and as no plea put in issue the validity of the obligation to pay interest at the rate of eight per cent. upon the $7,000 made, by the contract, payable in New York, no question could arise, in that suit as to the usurious character of the eight per cent. interest, because it was more than the laws of New York allowed.    After such a verdict and judgment in his favor, the credi-

tor might sue the other debtor upon the same contract; if he did the defendant could not doubt his right to a defence. He might file a plea of usury, alledging that the $7,000 and the interest reserved thereon, were made payable in New York, whose laws declared any rate of interest exceeding seven per cent. per annum usurious, and made all contracts tainted with usury, void. According to the judgment of the Court against the first defendant, the second would have sufficient proof, the proof afforded by the written contract, to shew that the parties made the contract in relation to the $7000, and the interest, reserved upon it in reference to the laws of New York. He would therefore be able to shew, by the same kind of evidence, that had been held sufficient to prove in the first case, that the other part of the contract was made in reference to the laws of Louisiana, which allowed it, that this part of the contract was made in reference to the laws of New York, where such a rate of interest was usurious, and made the contract in which the interest was reserved, void. With such proof, and such a decision as to the effect of the evidence, his defence would seem to be impregnable. But according to the new international law, to which the defendants in error insist, the old must yield, the creditor would be entitled, in effect, to elect whether the law of the place where the contract was made, or of that where it was to be performed, should determine the validity of the contract, and the extent of its obligation. Guided by his interest, he would, in the last case, elect that his contract to pay $7,000 and interest, at the rate of eight per cent. per annum, in New York, should be governed by the laws of this State, where the contract was made. In the first case, the law of the place of performance was applied to the contract by which the creditor's interest was secured, but if that law would injure him, he may, according to the rule, take the benefit of the law of the place where the contract was entered into. He may, in such a case as the last which was supposed, disregard the proof that was deemed sufficient to shew the parties made the contract in reference to the laws of the place of performance, and would shew the same fact again, if the effect of evidence were allowed to be uniform. If proof that the parties made the contract in reference to the law of a particular place, be disregarded, why not give the debtor the right to elect between the *lex loci*

*contractus* and the *lex loci solutionis* instead of the creditor. His election dictated by his interest, would be as competent and credible proof against the evidence afforded by the written contract of both parties, as the creditors. [Story's Confl. Laws, 246, § 296.]

If a creditor were to take a note in his favor in this State, and secure the debt due to him by a mortgage upon real estate in Louisiana, with interest, at the rate of ten per cent. per annum, and the note was not payable in that State, the Courts here must hold it to be a usurious contract under our laws. A note bearing such a rate of interest, made in New York, not payable in Louisiana, but secured by such a mortgage upon real estate in Louisiana, would be a violation of the usury laws of New York. It is a singular specimen of comity to uphold a contract made here to accomplish an object in New York, which could not be attained, if the same contract had been made as well as payable there, and which could not be accomplished in this State, upon a contract made here, to secure the payment of more interest than the laws of Alabama allow. [Story's Confl. Laws, 238, §287.]

DARGAN, with whom was GIBBONS, contra. The first question is, where was the contract made in contemplation of law? We say in Alabama. This appears from the facts. Hitchcock is under liabilities in Alabama, either as drawer, indorser, or acceptor, of certain bills of exchange, held by the Bank of the United States. He resided in Alabama, and it was his only place of business. If the liability grew out of the drawing or indorsing of bills payable out of this State, his indebtedness arose in Alabama, on the failure of the parties anteriorly liable on the bills. If his liability arose from acceptances made in Mobile, there can be no question raised. Being thus liable for the debt in Alabama, he goes to Pennsylvania to negotiate for the extension of time on the debt, and there makes the proposition, which is accepted, and out of which the bond and mortgage come. What is this proposition? It is an offer to do something, *not in Pennsylvania, but in Alabama,* where the debt is payable, at that time. What is the ratification of it? An acceptance on the part of the Bank of the offer of securities to be executed in Mobile. It is the same thing, and no

more, as if Hitchcock had dated and written the letter in Mobile, and the Bank had replied, by instructing its agent, directing him to carry out the details here.    If Hitchcock had treated directly with Poe, here, there could have been no pretence that the locality of the contract was not in Mobile; and yet, in that case, the transaction would have been virtually the same, for Poe's authority to make the contract, would have been derived from Pennsylvania; and the principal acts as much in Alabama, by his agent in that State, as though the principal were present there.    And, discarding these views of the  previous treaty between the parties, it is enough  to say  that the bond and mortgage are actually executed here, and they are alone the subjects of inquiry.

See for a  case exactly in  point,  Chapman v. Robertson, 6 Paige, 627.   This case, in  fact, differs from  the present in wanting the same evidences of the place of contract, which  in ours arise from the debt having been incurred in Alabama, and the further advance being made in Alabama; but the locality of the mortgaged property is alone considered as a sufficient test.

The fact, then, being established that Alabama is the place of contract, let us inquire if the charter be violated?    The alledged violation is of the 6th fundamental article :  " The rate of discount at which loans may be made *within this commonwealth,* shall not exceed  one-half of one per centum, for thirty days."

To this alledged violation there  are two  answers: 1. That this case presents  no loan, or discount, but  merely the taking of security on a  debt already  past due; except as to the advance of the $100,000 which will be presently examined.

2. That the contract being  made in Alabama, it is not, in any case, within the restraint imposed, because  that can only apply to operations within the commonwealth of Pennsylvania.

On the first it is only necessary to say, that to bring the present case within the restriction of the charter, a loan, or discount in the ordinary course of banking transactions, must be shown; the arrangement of delayed debts, and taking securities, after the manner of the present case, would not, if done by the Bank in Pennsylvania, be governed by the charter, but by

the general interest law of that State.   [9 Wendall, 471.]   As
to the $100,000 advanced, that is no *loan* to Hitchcock; it ap-
pears on the face of the agreement, to be an advance by the
mortgagee for the improvement of the mortgaged premises, and
increase of the security; and as such could have been laid out
by the mortgagee, if necessary, without the concurrence of the
mortgagor, and equity would have allowed it, with interest, in
an account for foreclosure, before the register.   How can that
be a loan to a man, which he is expressly forbidden to use as his
own money, and which remains, in its disbursement, subject
to the control and application of the supposed lender?   For au-
thorities as to the right of the mortgagee to be refunded for im-
provements, see 3 Powell on Mortgages, 956, note.

But it was part of the inducement to the Bank, and was to
be expended for the benefit of both, by the agreement of both.
[1 Powell on Mortgages, 313, note.]

2d.   Be the contract what it may, the restriction of the char-
ter does not apply, because the act is not done *within the com-
monwealth* of Pennsylvania.   The Bank derives the power to
make its contracts, not from the fundamental article under con-
sideration, but from the previous section of the law, creating
the corporation, and defining its powers.   The article is mere-
ly a restriction, and, as such, must receive a strict and literal
construction.   Its character is wholly local, as appears by its
very terms, and it leaves the power given by the charter thus:
the contracts incident to a banking corporation may be made
any where, subject only in Pennsylvania, to the rate of dis-
count prescribed; and in other countries subject to the restric-
tions of such countries only.   [13th Conn. Rep. 227.]

To the second objection—Is the contract void because against
the general interest law of Pennsylvania?   It is sufficient to
say, that assuming the place of the contract to be Alabama, the
general interest law of Pennsylvania, cannot apply to it, at all.

The third objection—Is the contract void because against
the statutes of usury in New York?

There is no pretence that the contract was *made* in New
York.   The supposed violation must consist in the payment
proposed to be made in New York.   The objection rests on
the general rule, that the statute of usury of the place of pay-
ment, must govern the character of the loan.   The answer to

JANUARY TERM, 1845. 421

Heirs and Adm'r of Hitchcock v. The United States Bank of Pennsylvania.

this is, that where the parties contract with reference to the laws of the place where the contract is made, and under such laws stipulate for a higher rate of interest than is allowed by the laws of the place of payment, such stipulation is valid, and the interest is is not usurious. That such is the law, see 2 Kent's Com. 260, et seq.; 6 Paige, 627; 20 Martin, 1; 9 Porter. 1; 13 Peters, 65; also, 520; 2 Atkyns, 382; Story's Confl. 252; 7 Paige, 616.

Fourth objection—Is the contract void because in violation of any law of Alabama?

There may be two grounds supposed to be intended—one, that we have taken more than eight per cent., because the advance was made in Alabama money; another, that we have taken more than six, against the third section of the interest law of 1818.

The first ground is completely swept away by the case of B'k of U. S. v. Waggoner, 9 Peters, 378.

To the second, the answer is, that the third section of the interest law of 1818, has no application to this case.

The first law is that of 1805—fixes six per cent., on bond or note, for money; if more be taken principal only shall be recovered. If taken by way of corrupt bargain, the person paying may recover principal and interest. That six per cent. allowed on bonds and notes, after payable. This law does not affect this inquiry, and is moreover repealed.

Next comes the act of 1818. First section, allows any rate of interest expressed in writing. Second, where no rate is expressed, eight per cent. to be allowed. Third—Provided nothing in this act shall make it lawful, for any Bank to take more than six per cent. on its loans and discounts.

Next comes act of 1819—First section, fixes eight per cent. Second section, fixes penalty. Fourth section, makes usurious bonds void.

The first section of the act of 1818, was repealed, November 22, 1819, and fourth section of 1819, repealed January 17, 1834.

The third section of the act, merely, then, amounts to this, that no Bank, claiming by virtue of the second section of the act of 1818, to take eight per cent., when no rate of interest

was expressed in the contract, should do so, on its *loans* or *discounts*.

The act is clearly applicable only to such Banks as were then in existence in the State of Alabama. [Huntsville Bank, chartered 1816, and limited to six per cent. on *loans* and *discounts*; St. Stephens' Bank, chartered 1818, (same day as law,) limited to six per cent. on loans and discounts.] And, moreover, the proviso applies only to loans and discounts made in the way of banking. The general interest law of eight per cent. would govern after the debt was due, unless some provision of the charter to the contrary.

It may be said that this proviso, with the provisions of the charters then existing, and since granted, shows a policy which we have infringed.

To this we answer, that such doubtful evidence of a policy ought not to be relied on. [See Richardson v. Mellish, 2 Bing. 229; 13 Peters, 582.] But, moreover, the policy, if granted, would only reach *loans* or *discounts*.

There is also a vague charge of usury committed under cover of discount, compounding, &c. The intention is every thing, in this allegation. For the definition of exchange, see 13 Peters, 65; 9 Peters, 378.

The law of the place where the contract is made, must determine the consequences to be visited upon it, when it is tested as to its validity or invalidity. [9 Porter, 1; 13 Peters, 65; 8 Wheaton, 538; 5 East, 129; 12 John. 142; 10 Wheat. 367.]

This view, thus far, goes on the presumption that no one of the laws has been violated; but let us see what would be the consequence of the violation of either, or all. Would the contract and securities be void?

1. If in the violation of the charter, in the sixth fundamental article, (assuming, for the sake of argument, that the transaction is either *loan* or *discount*,) the article under consideration is a restriction on the general common law power of the corporation, to take interest after any rate agreed upon between itself and borrowers; it is, in effect, to the corporation what the general interest law of Pennsylvania is to an individual. In the absence of the restriction in the charter, and the law regulating interest at large, the corporation and the individual might lawfully stipulate for any rate. What, then, is the effect in

Pennsylvania, of the violation of the restriction imposed on the individual. See Turner v. Calvert, 12 Serg. & R. 46.

The foundation of this is plain; neither does the general law or charter make a forfeiture of the contract the penalty of violation. To confirm this, see 13 Con. 249; Fleckner v. B'k of U. S. 8 Wheat. 338; De Wolff v. Johnson, 10 Wheat. 367; B'k of U. S. v. Waggoner, 9 Peters, 378, affirming the case of Fleckner. Nor does the provision in the charter, for a *scire facias* by the Governor, alter the effect, as to the validity of the contract. See Fleckner v. B'k of U. S., supra.

In answer to the case of B'k of Chilicothe v. Swayne, et al. 8 Ohio, 258, which is the only case that appears to decide the point differently, the Court proceed upon the ground, plainly erroneous, that the right to take interest is derived from the restriction. The reasoning of the judge on the first point, as to the effect of the general law on contracts, made by individuals, is undoubtedly at variance with the conclusion he arrives at, when he applies the rule to the Bank; for in each case there is a restriction on a general common law power. This case is irreconcileable with Waggoner's case, in 9 Peters, 378; for there the intention to evade the charter corruptly, is made the test. Plainly, the *quo animo* need not be made an ingredient, if there be no capacity to make the contract at all; it would be *ipso facto* void, no matter how innocent, or meritorious the consideration. Besides, the Judge's own proposition in 8 Ohio, is a refutation of the argument. He supposes an acquisition of more land than was necessary for the convenience of the corporation, would be void for the whole grant. This cannot be, for there would be an express authority to hold so much as was necessary; the grant would be only void for the excess. The question, in both cases, is not a question as to capacity to make a contract of a certain character, but as to the degree and mode in which such capacity was to be exercised. Enough has been seen to settle the effect of the Pennsylvania statute. That does not avoid the contract in terms, and as, has been shown, the Courts have so held. [Turner v. Calvert, 12 Serg. & R. 46.]

How is the contract affected by statutes of usury of New York? The only pretence for applying those statutes at all, must, of course, be the payment of eight per cent. interest

there—the legal rate being seven—and a contract made there to take more, being declared void. Even if the agreement between the Bank and Hitchcock had been made in New York, the security being situated in Alabama, it has been decided by the Courts of New York, that stipulating for the rate of interest lawful in the place where the security is situated, is not corrupt or unlawful. See Hosford v. Nicholas, 1 Paige, 220; Chapman v. Robertson, 6 Paige, 627; Quince v. Callender, 1 Dess: 160. The statutes of Alabama do not make the contract void.

But if it were an unlawful contract, by the laws of every other State in the world, it is lawful, by the laws of Alabama, where it was executed, and no authority need be cited to prove that the Courts of this State will look alone to the laws of this State, in determining its character. [14 John. 339; 5 Harris & Johnson, 100, 109; 13 Peters, 65; 9 Porter, 1.]

1. We have shown that the contract is entirely consistent with the laws of Pennsylvania, New York and Alabama.

2. That if inconsistent, it is not void.

Let us consider whether any defects which might have existed in it, have not been removed by the payment of $150,-000, and also the consequences of such removal upon the defences pretended.

We have shown that the contract could not be void by any of the laws alledged to have been violated. If defective at all, the only consequence would have been the abatement of the interest, in accordance with statutory regulations. The general rule as to the confirmation of such contracts is found, 1 Story Eq. 336, note; Comyn on Usury, 183; see, also, De Wolff's case, 10 Wheaton, 367.

Thus the defects are purged from the contract; or, if not, the agreement to receive $150,000 in satisfaction and abatement, amounts to an accord and satisfaction at law, and these defendants are estopped by it, from any inquiry into the nature or extent of the defects which they have thus been compensated for.

For Mrs. Hitchcock's power to execute the trust in the will, see Judson v. Gibbons, 5 Wendell, 225; 1 Sugden on Powers, 138; 2 Ib. 337; Willis on Trustees, 10 Law Lib. 65, note; Butler v. Leavins, 8 Porter, 380; Powell on Devises, 303; 21 Law Lib. 136, notes.

This brings us to the consideration of Mrs. Hitchcock's deed. The effect of this must be governed by the intention. [3 Powell on Mortgages, 1088, and note, and authorities there cited.]

There can be no doubt of the intention here. The payment of $150,000 relieved the bond and mortgage from any defects. The parties intended that complainants should go into possession, under the mortgage, as *bona fide* mortgagees, leaving to creditors their right to attach the securities, if they pleased ; in which case the real debt and interest must have been paid to complainants, before the possession under the mortgage, could be vacated.

But above all, it has been repeatedly held, that where a note or other security is given for a pre-existing, valid, debt, as in this case, the $520,000 the debt due on unimpeached bills of exchange, although such note or security be void, for usury, yet the original debt is valid, and may be recovered. [5 Wendell, 597; 1 Henry Blackstone, 462; 7 Modern, 119; 2 Taunton, 184; 3 Campbell, 119; 19 Johnson, 150, 294; 11 Mass. 359; 8 Cowen, 77, 40.]

It is thus often held, that when a bond or deed is void for champerty, as on account of the relation between the parties, yet in declaring such deed void, the security is decreed to stand for the debt actually due. [18 Vesey, 119, 120; 3 Porter, 115; 12 Serg. & R. 46.]

ORMOND, J.—Before proceeding to the consideration of the merits of the case, we will first examine the objection to the parties. It is urged, that it is uncertain who are the complainants. The bill is filed by Cowperthwaite, Dunlap & Cope, to whom, acting for, and on behalf of the Bank, the bond and mortgage were executed. The next bill in order, is an amended and supplemental bill, filed by the complainants, in which they disclose the fact, that they are mere trustees for the Bank, and pray that the Bank may be made a party. Another amended and supplemental bill was filed, reciting at length the two former bills, and, among other things, disclosing the fact, that Cowperthwaite, Dunlap & Cope, had assigned all their interest in the mortgaged premises, to James Dundas and others, and pray, that the assignees may be admitted complainants, with

54

the Bank, and that the names of Cowperthwaite, Dunlap & Cope, be stricken out of the bill.

It cannot be doubted, that all these persons, who at different times, make their appearance in the cause, constitute, in law, but one person. Cowperthwaite, Dunlap & Cope, who filed the first bill, were mere trustees, but did not disclose their *cestui que trust*. In the second bill this is done, but certainly this cannot prejudice the rights of any, or create any difficulty. Afterwards, when the Bank went into liquidation, the fact is brought to the notice of the Court, and the names of the assignees spread upon the record, as parties complainant. This was undoubtedly correct. It does not appear from the record, whether Cowperthwaite and others were dismissed, as they prayed to be. They therefore remained as nominal parties, having ceased to have any interest in the matter in litigation.

It is supposed, that they are placed in such an attitude, that they may be considered as parties to the bill, or not, as may suit their convenience. This is undoubtedly a mistake. They are parties to the bill, and as such, estopped from denying any fact there alledged by them.

This is not the case of a party who has no interest, joining in a bill with one who has. The interest of all these parties is the same. The bank is the principal, the others are trustees, in whom the title is vested. It is, in fact, merely the case of trustee, and *cestui que trust,* uniting in the same bill; and although in this case, the Bank was not a necessary, it was certainly a proper party to the bill.

Proceeding to the examination of the merits, we will in the first instance, endeavor to ascertain the place where the contract was made. Henry Hitchcock, resident in Mobile, goes to Philadelphia, and makes the following proposition to the Bank of the United States :

*Philadelphia, May* 25, 1838.

Sir—I, the undersigned, am indebted to the President, Directors & Company of the Bank of the United States, in the following sums, independently of my liability for others, not now brought into view, and for the payment of which sums other satisfactory arrangements will be made, viz:

[Here follows a list of the debts, amounting, in all, to $520,-530 96.]

To this sum, it is now proposed that the Bank add in money, in Mobile, for the purpose of improving and rendering productive, the improved portion of the real estate hereinafter proposed by me, to be mortgaged to the Bank, to secure the payment of the above debt.  This sum to be advanced, and the prior *liens* upon it, hereinafter mentioned, with the interest on the whole, at the rate of eight per cent. to be advanced as the improvement progresses, and the payments are required.

[Then follows a list of the *liens* which existed upon the property proposed to be mortgaged.]

To secure the payment of the above sum of $620,530 96, after payment of the existing *liens* above named, with interest on the whole debt, as above, and all the advances, which have or shall be made, by the said Bank, on account thereof, at the rate of eight per cent. per annum, at the following periods of time, and in the following proportions, in the city of New York, that is to say : Two fifths thereof, of principal and interest to 1 March, 1838, (as stated above,) on 1 March, 1839.

One-fifth thereof, (as above,)          1 March, 1840.
One-fifth thereof,                  .          1 March, 1841.
One  do.  do.                            1 March, 1842.

The whole to be paid as above, in the city of New York, with the whole amount of the above debt and incumbrances unpaid, to be paid half yearly, in New York, on the 1st September, 1838, and on the 1st day of March and September, in the years 1839, 1840, 1841, and 1842, until the whole is paid ; and I do hereby promise, to make and execute, in due form of law, to the said President, Directors & Co. of the Bank of the United States, their successors and assigns, a full and sufficient deed of mortgage, of all the following described real estate, free from all incumbrances, except as herein specified :

[Here follows a list of the property, with the value, amounting in all to $986,200 00.]

And I hereby, also promise, contract and agree, to, and with the said President, Directors & Company of the Bank of the United States, faithfully to invest the whole of the said sum of one hundred thousand dollars, herein proposed to be advanced to me, by the said Bank, for that purpose, in the substantial and beneficial improvement, of such portions of said mortgaged real estate, as may most require it, to make it productive; to

be laid out and expended, under the supervision and approbation of George Poe, as agent of the Bank, at Mobile, previously obtained: who shall also be appointed by me, by a proper instrument of writing, the sole receiver of all the rents and profits of the said real estate, to be mortgaged to the said Bank, until the debt is fully paid; to be paid by him as received, half yearly, on the 1st of March and September, of each year, to the credit of my said debt and liability, as above referred to.

And I do hereby further stipulate and agree, that on my failure to pay, or on the non-payment of any one of the said annual instalments of principal, or the interest, half yearly, as the same shall become due and payable, as herein provided for, the entire debt, with the interest that shall be then due thereon, shall be deemed and considered as all due presently, and on demand. And the said President, &c., shall thereupon, and in that case, have the right, and be at full liberty, to proceed to foreclose their said mortgage, without further delay, and sell the said mortgaged real estate in parcels, as they may deem best, for cash, to the highest bidder, and apply the proceeds towards the payment of the said mortgage claim. And if the proceeds of the said real estate, after the payment of the existing *liens*, with all costs and legal charges against it, shall not be sufficient to discharge and satisfy their said claims in full, I hereby promise and contract, to pay to the said President, &c., the deficiency. The surplus, if any, after discharging said claims, to be paid to me, &c.

HENRY HITCHCOCK.

NICHOLAS BIDDLE, Esq., President, &c.

Upon which proposition the Bank made the following order:

*Bank of the United States, May 25, 1838.*

The above and foregoing proposition of Henry Hitchcock, has been agreed to, and accepted by the President, Directors & Company of the Bank of the United States, and their agent at Mobile, George Poe, Jr. Esquire, will be authorized and instructed to carry it into immediate effect, on the part of the Bank. HERMAN COPE, 3d Cashier.

The agreement was consummated in Mobile, on the 14th July, 1838, by the execution of the bond and mortgage, contemplated by the proposition of Mr. Hitchcock. The sum stipulated to be advanced, $100,000, was paid to him at different

periods, between the 14th July and the 24th November, of the same year; and was expended in the improvement of the mortgaged premises.

By the proposition made in Philadelphia, Mr. Hitchcock distinctly admits his indebtedness to the Bank; where this debt was created, does not appear, and it is therefore fair to assume that it was created in Mobile.   Be that as it may, he admits his indebtedness, and proposes an additional advance to him in Mobile, and in consideration thereof, agrees to execute a bond and mortgage on certain property in Mobile.   This proposition, though acceded to by the Bank, is certainly not the contract of the parties; it clearly contemplates the execution of the contract there proposed, in Mobile.   The fact that Mr. Hitchcock was in Philadelphia when the proposition was made, has no tendency to show that the contract was there executed. It is, in effect, precisely the same, as if the proposition had been made by letter from Mobile.   It is, in fact, a proposition to make a future contract in Mobile, which the Bank acceded to, and promised to direct their agent to execute.   Both parties so considered it.   Mr. Hitchcock lived in Mobile; there the property to be mortgaged was situated—there the money was to be received—there the mortgage was to be made—in a word, there the proposition was to be carried into effect, by the execution of the contract.

On the 14th July, 1838, in Mobile, Mr. Hitchcock, pursuant to his proposition, executed to Messrs. Cowperthwaite, Dunlap & Cope, his bond, admitting his indebtedness to the Bank, in the sum of $620,530 96, with interest, at the rate of eight per cent. per annum, from the 1st March, 1838; the interest to be paid semi-annually, and the principal in four annual instalments, in the city of New York.   On the same day, he executed to them a mortgage on a large amount of real estate, situate in Mobile, to secure the payment of the debt.

It is now insisted that this contract is void, because the Bank had no power by its charter, to make any contract, reserving a higher rate of interest than *six per cent. per annum*.   That it is void, because it violates the law of Alabama—and if both these propositions are incorrect, then it is void by the law of the State of New York, where, by the terms of the contract, it was to be performed.

The law of Alabama, supposed to be violated by this contract, is not the general law against usury, which allows eight per cent. per annum, to be reserved for the loan of money, or forbearance of a debt; but it is the proviso to the act of 1818. [Toulmin's Dig. 443.] The act of 1818, authorized any rate of interest to be reserved, for the loan, or use of money, &c., which the parties might agree upon in writing; to which is a proviso, in these words: "Provided, that nothing in this act contained, shall be so construed, as to make it legal for any bank to receive more than at the rate of six *per cent. per annum*, for and upon its loans and discounts." This act was changed the succeeding year, by an act forbidding more than eight *per centum*, *per annum*, to be reserved on any loan of money, but without expressly repealing the former act. In the compilation of the law subsequently made by Mr. Aikin, this proviso is incorporated with the statute law, Aik. Dig. 263, § 3, and again in Clay's Dig. 284, § 3. The argument drawn from this, is, that it is a statutory declaration, that no bank shall take more than at the rate of *six per centum, per annum*, on its loans and discounts—that this prohibition must apply, as well to foreign corporations who, by comity, are permitted to make contracts within our limits, as to our own banks.

It is impossible to misapprehend the intention of the proviso to the act of 1818, at the time of its enactment. At that time, the Huntsville Bank was in existence, and the Tombeckbee Bank was chartered at the same session, and in the charter of both these banks, there was a prohibition against reserving more than six per cent. per annum, on their loans and discounts. The proviso, then, was inserted from an apprehension, that, in the hands of a corporation, the power to stipulate for any rate of interest the parties might agree on, would be liable to an abuse, which would not attend the same contract between individuals. Such being the intention of the proviso, and all the banks of the state being confined, by their charters, to six per cent. interest, it is not easy to perceive for what purpose it was retained on the statute book, after the power given to individuals to stipulate for any rate of interest, was taken away; especially as the prohibition against taking more than six per cent. per annum, has been repeated in the charter of every bank incorporated since that time.

Subsequent laws have been passed, authorizing the banks of the State to take more than six per cent. per annum, in certain cases, and neither the restriction in their charter, nor the proviso we are now considering, has ever been supposed, to extend to the purchase by the banks of bills of exchange. It would, therefore, seem perfectly clear, that the proviso is a dead letter as it regards our own banks, and has been retained on the statute book, without any distinct apprehension of its true intent and meaning. It is not credible, that it was retained on the statute book, with the design that it should operate on foreign corporations. Such was certainly not the design of its enactment, and if the legislature had subsequently conceived the intention of passing a law to operate on foreign corporations, it is inconceivable that they should have adopted this obsolete proviso, to effectuate their purpose. Without therefore entering upon the inquiry, whether this contract can be considered, either a *loan*, or *discount*, we cannot come to the conclusion, that the transaction is forbidden by any law of this State.

Is the contract void, because the money was to be paid in New York, where the statute rate of interest is seven per cent., and all contracts reserving a higher rate of interest, are declared void?

This is a question of the highest possible magnitude, from its intrinsic importance, and the vast amount of property involved in its solution. It has been argued, with an earnestness, and ability, commensurate with the stake. It has received from us a patient and most deliberate examination, and we will now proceed to state the results of our deliberations.

Upon this vexed question, certain propositions have been generally, if not universally, admitted. Personal contracts, are to have the same validity, force, and interpretation, in every other country, which they have in the country where they are made; provided, the contract is not offensive to the rights, morals, or public policy, of the country, in which it is sought to be enforced. If the parties stipulate for the performance of the contract in another country, the law of the place of performance will govern the contract. It follows, as a corollary, from this, that, if the rate of interest be higher at the place of performance than it is at the place of contract, the parties may stipulate for the higher rate of interest; and if the contract is

silent as to the interest which is to be paid, for delay, after the contract matures, the law of the place of performance will furnish the rule.   [Story Con. of Laws, 2 ed. 246, 252; 2 Kent's Com. 4 ed. 459 to 461; Andrews v. Pond, 13 Peters, 65.]

May the parties stipulate, for the rate of interest allowed by the place of the contract, when that is higher than that of the place of performance?   Upon this question, unfortunately, there is a great diversity of opinion.

The Supreme Court of Louisiana, held the affirmative of this proposition, in Depau v. Humphries, 8 Louisiana Rep. 1. That, was the case of a note made in Louisiana, payable in New York, the parties stipulating for the payment of a higher rate of interest, than was allowed by the usury laws of the place of payment.   The case was most elaborately considered, and after a full examination of the civil and common law writers, and authorities, the Court determined, that the contract was valid.   So, also, Chancellor Walworth held the same doctrine, in the case of Chapman v. Robinson, 6 Paige, 627. There the facts were substantially the same, as in the preceding case, with the additional fact, (which also exists in this case,) that a mortgage was executed by the debtor, on lands, lying in New York, the place where the contract was made, though to be performed in England.   See also, to the same effect, 7 Paige, 616.

On the other hand, Judge Story, in his Conflict of Laws, after reviewing these decisions, maintains, that a rate of interest higher than that of the place of performance, cannot be stipulated for, though it be allowed at the place of the contract.   [Story Con. of Laws, 247.]   Amidst this conflict of jarring opinions, we must determine this question on principle, and by analogy to other known and settled rules of law.

A corrupt intention to take illegal interest, is of the essence of usury.   When a note is made in this State, and here payable, reserving a higher rate of interest than the law allows, the intent to commit the offence of usury, is apparent upon the contract itself.   If made here, and payable elsewhere, such an intent may, it is true, exist, but it does not appear from the contract; and as the intention may be fair, and honest, a Court of justice ought not to presume it to be otherwise.

Chancellor Kent says, " The general doctrine is, that the law

of the place where the contract is made, is to determine the rate of interest, when the contract specifically gives interest; and this will be the case, though the loan be secured by a mortgage on lands in another State, unless there are circumstances to show, that the parties had in view the law of the latter place in respect to interest." [2 Kent. Com. 469, 4th ed.] So, also, it is clear, that, although the interest of the place of payment may be agreed on, though it be higher than that of the place of the contract, yet, if the intent be to obtain usurious interest, the contract will be void. [Andrews v. Pond, 13 Peters, 65.] As, therefore, the place of the contract, in the absence of any corrupt intention, furnishes the rule, when the contract specifically gives intercst, it would seem to follow necessarily, that the contract, if valid there, would be valid at the place of payment, though it reserved a higher rate of interest than was allowed by law, on contracts made at the latter place.

There is, however, another incident of this contract, which more peculiarly stamps its true character, at least in this State, and upon this proceeding. The bill is filed, to have the benefit of a mortgage executed here, upon lands situate here. This mortgage was made to secure the payment of a debt created here, reserving the legal interest of this State, and this was the domicil of the debtor. Can we refuse to enforce this contract, which strictly conforms to our own laws, merely because the money, to secure the payment of which, it was made, was payable in another State, where the rate of interest was lower than it is here? In our opinion, we cannot. It is not pretended that the form of the contract was a cover to evade the usury law of New York. The contract is therefore to be considered as *bona fide*, it is authorized by our law, and we cannot refuse to enforce it.

We have not considered it necessary to examine at length the numerous English and American cases, cited by the plaintiffs' counsel on this point, to be found on the brief of their argument. None of them are precisely in point, though there are *dicta* going the length contended for by them. The cases cited by the defendant's counsel, from 8th Martin, and 6th and 7th Paige, are identical with this, and, in our opinion, determine the law correctly. We are conducted to this conclusion, not only because, upon authority, such appears to be the law,

but also, because it accords with sound morality, and the obli-gations of good faith.

It is further contended, that the Bank had no power to make this contract, by the charter.

The fifth article of the act incorporating the Bank, contains the general grant of power to the Bank, to hold real estate un-der certain restrictions—to deal in bills of exchange, &c. A portion of the sixth article is as follows: " The rate of discount at which loans shall be made within this commonwealth, shall not exceed one-half of one per cent. for thirty days."

It cannot be doubted, that the legislature may impose such terms as it pleases, to the exercise of a power granted to a cor-poration, and if the power be not exercised in the mode pre-scribed, the act will be void. [Head & Amory v. The Provi-dence Insurance Co. 2 Cranch 127; N. Y. F. Ins. Co. v. The M. F. Ins. Co. 7th Wendell, 31.] Here the legislature have not prescribed the mode, in which the power shall be exercised. The power to loan is expressly granted, with a prohibition, that not more than six per cent. per annum shall be taken, or reserved, upon its loans, within the State of Pennsylvania. It may be conceded that a violation of this restriction, would, within the State of Pennsylvania, render the act void. Such was the decision of the Supreme Court of the United States, in the case of the Bank of the U. S. v. Owens, 2 Peters, 527. The principle of the decision, avowed by the Court, and sustained by numerous citations, is, that the act, which, in that case, was lending money, at a higher rate of interest than the charter au-thorized, was an act in violation of a public law, and therefore void. The same decision was made by the Supreme Court of Ohio, in the B'k of Chilicothe v. Swayne, 8 Ohio Rep. 258; but the reason assigned is, that the Bank had no power to act, but in accordance with the terms of the charter, which is, perhaps, in substance, the same principle. A different conclusion was ar-rived at by the Supreme Court of Connecticut, in the case of the Philadelphia Loan Co. v. Towner, 13 Conn. 249, where it was held, that such an act was merely a violation of the usury laws of Pennsylvania, and the security only was void. In these cases, the act complained of, was a violation of the stat-ute law of the State where the contract was made; in the case of the United States Bank v. Owens, of an act of Congress; but

in this case, there is no violation of any law. The prohibition of the charter, by its express terms, does not extend beyond the limits of Pennsylvania, and cannot have an *extra* territorial efficacy, as a law.

It cannot be controverted, that a corporation, when permitted to act by the comity of another State, within its limits, can exert no power, and do no act, which it is not authorized by its charter to do. These faculties, when exerted in a foreign State, must be in subordination to its laws, and declared public policy. It would, therefore, have been a most useless act in the legislature of Pennsylvania, to undertake to prescribe the conditions upon which it should exert its faculty of lending money, in a foreign State, where, by comity, it might be permitted to act. All that it was in the power of the legislature of Pennsylvania to do, was to give it the capacity to do the act. It did confer on it the power to lend money, and when it exerts this power in a foreign State, it must conform itself to the laws of that State. If the prohibition had been ten, instead of six, per cent per annum, most certainly this would not have authorized the Bank to take more than the legal rate of interest, at the place where the contract was made, and for the same reason, it may take more, if the law of the place permits it.

The error of the argument, consists in not observing the distinction between the power to do an act, and a mere incident of the power; which being purely accessorial, may be done or omitted, without affecting the power itself. This precise point, was thus decided by the Supreme Court of Louisiana, in the case of Frazier & Co., and others, v. Wilcox and others, determined in May, 1843, of which we have seen a manuscript opinion of the Court. That was the case of the Pennsylvania Bank of the United States, establishing an agency in New Orleans, for the purpose of banking. In the case cited, it had made a loan at ten per cent. per annum, and the Court held, that as that rate of interest was allowed by the laws of Louisiana, the contract was valid, notwithstanding the restraint in the charter, on loans within the State of Pennsylvania.

The result of this investigation is, that the contract between Hitchcock and the Bank is not usurious, or made in contravention of the laws of this State, and that the Bank had the power to make such a contract within this State; it follows, therefore,

that the mortgage taken by the Bank, to secure the debt, may be foreclosed.

Here, our task would be at an end, but for the peculiar form of the decree of the Chancellor, that the complainants might, at their election, take a decree for a strict foreclosure, or have a sale of the mortgaged premises. This is only important to the defendants, upon the assumption that the mortgaged property is worth more than the debt secured by it. However improbable this may be, we cannot act upon the contrary presumption, but must assume that the heirs, and creditors, have an interest in the equity of redemption, which ought to be protected.

This brings us to the consideration, of the questions which arise under the conveyance by Mrs. Hitchcock, to the Bank.

It is insisted by the counsel for the plaintiffs in error, that the devise was to Mrs. Hitchcock as executrix; that she could not act under the will, except in her capacity of executrix; and that not having qualified as such, her acts were void.

The seventh clause of the will in which the particular devise in question is made, is as follows : " For the purpose of having my estate properly settled, and administered, during the minority of my children, I do hereby appoint my dear wife, Anne, my sole executrix; and I do bequeath and devise the same, both real and personal, to her, in trust,- with full power to sell, either at public or private sale, all, or any part thereof, and the proceeds to re-invest, and re-sell, at her discretion, for the purpose of paying my debts, and legacies, or for a more advantageous investment, and good, and sufficient, deeds, and conveyances, to make therefor. It being my intention, and will, that my estate shall be kept together and held in common, for her benefit, and that of my children, until they shall become of age respectively; at which time, and as soon after as any one of them comes of age, he, or she, is to receive their proportion; it being always understood, that my wife is to receive an equal proportion of my estate, with my children, she and they having share, and share, alike."

The will was made on the 13th May, 1836. On the 13th September, 1836, he published a codicil, re-affirming his will, and giving some additional legacies, and declaring, that it should include all his estate, real and personal, to that date.

On the 4th August, 1837, he made a second codicil, in which he recites the great revulsion which had just taken place in commercial affairs, and expressed his apprehensions that it might affect his estate, and made some change in the legacies he had previously given, and re-affirmed, and republished the will, in all other respects.

On the 21st February, 1838, he made a third codicil, in which he recites, that he has purchased some real estate since the date of the last codicil, which he desires his executrix to carry into effect according to the directions of his will.

On the 10th of August, 1839, he made a fourth and last codicil, in which he says he has reviewed the will, and previous codicils, and adds: "I have no new testamentary disposition to make, but desire, that my will as it results from four papers heretofore executed by me, be carried into effect." and after enumerating the four testamentary papers, and describing them by their dates, he continues: "To the end, therefore, that my said executrix shall have full power to sell, convey, and dispose of real estate, as well as all other property, I again declare my intention, that such power to sell, and convey, shall extend to all lands acquired since the making of said testamentary papers, as well as to those acquired before, full power being intended to be given her in this respect, I do, therefore affirm again, the said testamentary dispositions, and desire them to be carried into full effect, the last of course controlling previous dispositions, when inconsistent."

The office of the codicil, is to explain, add to, or subtract from the provisions made in the will. It is annexed to the will, and in law the will and codicils—if there be more than one—constitute but one instrument. [Fuller v. Hooper, 2 Vesey, Senr. 242.] In Leavens v. Butler, 8 Porter, 388, it is said by this Court—"A codicil is a part of the will; it is therefore to be construed with it, and may, as a context, confirm, vary, or altogether change an intention, expressed in the body of the will."

In the argument of this cause, great stress has been laid on the language of the fourth codicil, as showing that the devise to Mrs. Hitchcock, was in her character of executrix. It does not appear to us to be a just criticism. The devise to Mrs. Hitchcock in the will, is unconnected with her office of

executrix, and the power conferred on her is such, as does not appertain to that office. The estate both real and personal, is devised and bequeathed to her, "in trust, with full power, to sell, either at public or private sale, all, or any part thereof, and the proceeds to re-invest, and re-sell, at her discretion, either for the purpose of paying debts and legacies, or for a more advantageous investment," &c. More comprehensive language than this, to give her the absolute power over the estate, cannot be conceived. She had not only the power to sell in any manner she thought proper, but she might invest the proceeds in other property, and sell again; and this she might do in her discretion, either to pay debts, and legacies, or to make a more advantageous investment for the estate.

The design of the different codicils is apparent; they were rendered necessary by changes in the estate of the testator. As he supposed his wealth was increasing, he increased his benefactions; and it is most honorable to his memory, that one of the largest bequests, was to the free school of the city in which he lived, of which he had been the munificent patron, and which almost owed its existence to his bounty. In 1837, foreseeing to some extent the calamity which impended over him, he makes some alterations in the legacies proportionate, to the expected subtraction from his estate. In the last codicil, he declares that he has reviewed the former testamentary papers, and has "no new testament to make;" and reaffirms the will, and all the previous codicils. So far as we can judge from the codicils themselves, the principal design in their execution, was, that lands acquired subsequent to the date of the will, should be subject to its control. It is true, in the last codicil, he speaks of his *executrix* having power to sell real estate, but that he did not intend to circumscribe the power already given, is shown in the next sentence, where he says: "*I again declare* my intention, that such power to sell, and convey, shall extend to all lands," &c. Indeed, it would seem, that if this is not a devise in trust, and not a mere power, it would be difficult by language to create one. Whatever might be the effect of this codicil standing alone, when considered in connection with the will, to which it refers, and of which it is a part, not a doubt can be entertained as to its true intent and meaning—that it was the intention of the testator, to vest

Mrs. Hitchcock with full power over the estate, both real and and personal, to sell and dispose of the same, as in her discretion she might think proper, without reference to her character of executrix. The devise to her was not for the purpose of sale merely, but, " that it (the estate) should be kept together and held in common (by her) for her benefit, and that of the children, until they respectively come. of age." Can it be doubted, that if she had declined to qualify as executrix, it would not in the slightest degree have effected this devise in trust? See the case of Judson v. Gibbons, 5 Wendell, 225, where a devise to "executors hereinafter named," was held to be a devise in trust to them individually, and not as executors, from the control given to them over the realty, until the youngest child came of age. See also the authorities cited on the brief of the defendant's counsel, on this point.

We proceed to the consideration of the character of the sale, and conveyance, made by her.

It appears that after the death of Mr. Hitchcock, Mr. Herman Cope, as the agent of the Bank, came to Mobile, to endeavor to make some arrangement in reference to the property of the Bank in that place. That Mr. James Erwin, the brother of Mrs. Hitchcock, represented himself to be her agent, and after considerable negotiation, a compromise was effected, by which the Bank was to advance $150,000, for the purpose, as was alledged, of paying the unsecured creditors of Mr. Hitchcock. In consideration of this advance, all defence to the bond and mortgage upon the bill, which had been filed during Mr. Hitchcock's life, was to be abandoned, and the bill suffered to abate, by omitting to revive it. Mrs. Hitchcock was to convey to trustees for the Bank, all the estate, and interest, she had as devisee in the mortgaged premises—the Bank to be let into the immediate possession, and to relinquish all further claims on Hitchcock's estate, and take the mortgage property for the debt.

The agreement was executed apparently in good faith. The money was paid, and Mrs. Hitchcock executed her deed, in which she recites, that by virtue of the power conferred on her by the will of her husband, and in consideration of the sum of $773,453 23, (the amount of the mortgage debt and interest,) she "acknowledged, remised, released, conveyed,

and forever quit claimed, unto the trustees of the 'Bank, all the estate, right, title, interest, use, trust, property, claim, and demand whatsoever, at law, as well as in equity, in possession, as well as in expectancy, all and singular," &c., describing the mortgaged property, &c.

This is, beyond all doubt, a conveyance of the equity of redemption in the mortgaged property. The legal title was already in the Bank by the forfeiture of the mortgage, and there was nothing upon which the conveyance could operate, if it did not convey the equity of redemption. Such was the intention of the parties to it, as is obvious from the previous negotiations, and such is its legal effect. Mrs. Hitchcock is estopped by the deed, from denying that such was not her intention. The argument urged, that Mr. James Erwin was not her agent, is answered by the deed itself; and if in truth, as alledged, she did not receive the money, it must be charged to her implicit confidence in the agent, whose acts she ratified, by fulfilling all his engagements in her behalf. That this large sum of money, was paid to Mr. James Erwin, to extinguish the claim which he set up to eight store houses in Mobile, which were covered by the mortgage to the Bank, would be incredible, if it were not, as it is, fully disproved.

It is urged, that a trustee cannot "*release*" his interest without other operative words of transfer. Conceding this to be the law in the case of a naked trust, the law does not apply to this case. All the estate, whether legal or equitable, which Mr. Hitchcock possessed in the lands, passed, by the will, to his wife, for the purpose of enabling her to execute the trust; and if she had the power under the will, of disposing of the equity of redemption—a proposition which must be admitted —it passed, by this conveyance. As to the mode by which the transaction should be evidenced, it is apprehended that any assurance, which would convey the fee, would be sufficient for that purpose. It is however stated in 1 Powell on Mortgages, 260, in the note, " that a mere *release* indorsed on the back of the mortgage deed, will be a sufficient assurance, for by that means the equity of redemption, if conveyed to the mortgagee, will become merged and annihilated in the legal estate; and the mortgagee will be seized of the fee sim-

ple, discharged of the mortgage." He, however, recommends a separate deed, as more appropriate and usual.

But this deed is not, technically considered, a mere release. It is a quit claim deed, conveying all the interest, which, as devisee, Mrs. H. took in the mortgaged premises; and if such an assurance would have been sufficient to convey the equity of redemption, if made by Mr. Hitchcock, in his life, it is sufficient if made by his devisee.

The *bona fides* of this act on the part of the Bank agents, has been attacked, but we think without the least foundation in justice. The facts were, that the title of the land had been brought in question, and perhaps considered doubtful, by the bill filed by Mr. Hitchcock, charging the Bank with usury. To remove this objection, and to get into immediate possession of the mortgaged property, was the inducement to the compromise, for such in truth it was. The charges on this head against the agent of the Bank, are founded on the supposition, that the Bank debt was illegal, and the mortgage invalid; and it is no where alledged, or pretended, that the equity of redemption was worth the price paid for the compromise. It would seem to be in truth, if the money had been fairly applied to its legitimate purpose—the payment of unsecured creditors—a most valuable arrangement for them. It does indeed appear, that some stratagem was to be resorted to, to conceal the transaction from other creditors, which was certainly objectionable, as all artifice is; but we are unable to perceive any thing illegal, or immoral, in the transaction, on the part of the agents of the Bank.

It is now ascertained that the debt was not usurious, and the mortgage a valid security; it is therefore impossible that the contract by which the Bank paid $150,000 to quiet their title, and obtain peaceable possession of their own property, could be a fraud on any one.

The fact, that the estate of Mr. Hitchcock was declared insolvent after this contract was made, and executed by the payment of the money, does not affect its validity. In Darrington v. Borland, 8 Porter, 9, the Court say—at page 33—"I apprehend that the just construction of this act, (the act of 1806,) is to make lands liable, no matter how devised, or into whose hands they may pass, unless sold by a decree of the

Orphans' Court, or of Chancery; or unless when sold by a trustee, authorized, either expressly, or impliedly, by the will, the sale is *bona fide*, and the proceeds actually applied to the payment of creditors." In such a case, the right of the trustee, except so far as he has executed the trust, must yield to the paramount right acquired by the Orphans' Court, by the decree of insolvency. Here, however, before the decree was made, .the trustee had executed the trust, and received the money; and the subsequent insolvency of the estate, cannot vacate the sale, though it might entitle the administrator to the proceeds, for the purpose of distribution among the creditors.

We come now to the consideration of the decree made in the cause by the Chancellor. If no sale of the equity of redemption had been made, the decree would have been a common foreclosure and sale in the ordinary mode, and we are now to inquire, whether the agreement entered into by the agents of the Bank, with Mrs. Hitchcock, authorized the decree made by the Chancellor.

Our practice certainly is, not to decree a strict foreclosure; but we think with the Chancellor, that there is no impropriety in such a decree, when the facts of the case warrant it. If the property mortgaged is clearly insufficient to pay the mortgaged debt, we can see no reason why the mortgagee should be put to the expense of a sale, if he is willing to take a strict foreclosure. If the fact be not admitted, a reference might be made to the master to ascertain its value, and if the question were doubtful, and no consent given, certainly no such decree ought to be made.

In this case, although we consider the deed of Mrs. Hitchcock to be a conveyance of the equity of redemption, and that she had power under the will to make the sale, yet under the circumstances of this case, it was clearly competent for the administrator, who, after the estate was declared insolvent, was a necessary party to the bill, as the representative of the creditors, upon the allegation, and proof, either of fraud in the agreement made by the Bank with Mrs. Hitchcock, or that the equity of redemption was worth more than was paid for it, to insist on a sale of the mortgaged premises. No such allegation is made. The effort is to invalidate the bond and mortgage, and no suggestion has been made, that the mortgaged

premises will more than discharge the debt.   Nor is it at all probable that it is adequate for that purpose.   No possible good therefore, can result to any one from a sale of the property; but a most unnecessary expense would be incurred by such a course.   As therefore, the entire reason for decreeing a sale of mortgaged premises rests upon the interest of the mortgagor, if he has none, and the mortgagee desires a strict foreclosure, we are of opinion he is entitled to it.   For the practice of the English and the American Courts, and the reason on which it is founded, see 2 Story Com. on Equity, 293, and cases cited.

In equity, the maxim is, once a mortgage, always a mortgage.   If the parties stipulate, that it shall be redeemable during the life of the parties only, the heir may, notwithstanding, redeem.   [Newcomb v. Bonham, 1 Vernon, 7.]   So also in a similar case an assignee may redeem... [Pow. on Mort. 118, a, note 1.]   In Van Burgen v. De Marest, 4 J. C. 37, Chancellor Kent held, that, although there was a power of sale in the mortgage, as the right to redeem existed, it was proper to file a bill.

Although the right of the mortgagee to purchase the equity of redemption, is undoubted, yet a Court of Chancery looks with distrust upon such contracts, from the influence which the incumbrance gives the mortgagor over the mortgagee.   [Webb v. Rorke, 2 Sch. & L. 673.   See this doctrine fully stated in 1 Powell on Mort. 123, in note.]

Such being the law, we entertain no doubt of the jurisdiction of the Court.   The mortgagee had a right to have his title quieted by a decree of the Court, and by bringing all the parties before it, to obtain the judgment of the Court upon his title.

The question of dower is not raised upon the bill, nor put in issue, it is not therefore proper to make any remark in relation to it.

We have examined all the assignments of error, and believe, that the opinion here pronounced covers them entirely.  Let the decree of the Chancellor be affirmed.