199 So. 549

MAYA CORPORATION et al. v. SMITH et al.

8 Div. 6.

Supreme Court of Alabama.

Dec. 5, 1940.

Rehearing Denied Jan. 16, 1941.

Cabaniss & Johnston and K. E. Cooper, all of Birmingham, for appellants.

Street, Bradford & Street, of Guntersville, for appellee Smith.

Oliver D. Street, Jr., of Montgomery, and Thos. E. Orr, of Albertville, for appellees Street and Bradford.

Leader, Hill & Tenenbaum, of Birmingham, for appellee Steiner.

FOSTER, Justice.

The pleadings as originally filed are substantially set out on a former appeal. 227 Ala. 6, 148 So. 621. The facts there stated need not be repeated. Amendments have been filed since that appeal was disposed of. As amended, the bill alleges that there was a modification of the contract of January 1, 1926, effected at a later date (shown to have been March 24, 1926), and complainant consented in the amendment that the rights of the parties may be settled and

adjusted in the light of such changes, but does not set out his version of such changes.

It also alleges that the Cherokee Mining Company is a corporation, all of whose shares, except qualifying shares of others, "are and have all the time been owned by the Maya Corporation," as well as the stock of the "seven companies" assigned to it by complainant.

It prays, among other things, that the Cherokee Mining Company and Maya Corporation be declared trustees of said mineral interests conveyed by said "seven companies," for the benefit of complainant and said "seven companies", and for the purpose of the contract of January 1, 1926, and be enjoined from conveying said interests until said contract be complied with and until said corporations shall pay or cause to be paid to complainant the money and stock which under said contract should be paid before the mineral interest should vest in them, and for a decree against them for the amount they should pay complainant and for other specially described relief and for general relief.

As finally amended, it prays also that the court will ascertain the amount due complainant and those in interest with him, under said agreement of January 1, 1926, and give Cherokee Mining Company, Maya Corporation and said "seven companies" the option within a reasonable time of paying the amount due him and of issuing and delivering the capital stock in the Maya Corporation as agreed on and of restoring to the treasury certain stocks and correcting the stock set up and ownership of shares in the Maya Corporation pursuant to said contract of January 1, 1926. That if this is done as required, then the claims of complainant and his associates shall be vested in defendant. But if this is not done, then all the claims of said companies shall cease and be forever divested out of them and vested in complainant and his associates. We have not undertaken to copy the prayer but to state its substance as here material.

The contentions of the Maya Corporation are set out in its cross-bill and are substantially as stated in the report of the case on the appeal reported in 227 Ala. 6, 148 So. 621.

Without now considering the collateral questions and the decree as to them, the court in its final decree found that the contract of January 1, 1926, was executed and not rescinded but was modified on March 24, 1926, so "that the amount to be presently

paid by said Cullinan or said Cherokee Mining Company or said Maya Corporation on the debts of the said 'seven companies' should be three hundred thousand dollars to liquidate liens and mortgages against the properties of said 'seven companies' which were threatening foreclosure instead of paying at that time the $447,000.00 as stipulated in said contract of January 1, 1926; (2) that activities under subsection 'e' paragraph 2 of said contract should be curtailed to keep within the finance which the said Cullinan might be able to secure for said purpose; (3) that mineral lands which were being acquired under said subsection 'e' of said contract should continue to be acquired in the name of J. S. Cullinan as grantee and paid for in his name until April 1, 1926, but that after said date said acquisitions and purchases should be made and paid for in the name of Cherokee Mining Company as grantee, with the exception of lands upon which options had been taken in the name of J. S. Cullinan or the Southern Exploit Company and that in such last named instances deeds might be made to the person in whose name the option ran— but it was agreed that all activities in the purchase of lands under said subsection 'e' after January 1, 1926, should be for the account of the Cherokee Mining Company, but the court finds that said contract of January 1, 1926, has never been abrogated or rescinded and is still in full force and effect so far as concerns the issues in this case."

It is also found that said modification was as just set out and not material to the questions arising in this case, since it related to the acquisition of other lands than those here involved.

The court then found that the cash amount due complainant and his associates under said contract of January 1, 1926, was for 359,902 acres of land at $3 per acre or $1,079,706, which with interest to April 1, 1939 (about the date of the decree), was $2,143,570. That from this amount should be deducted the total sum of $738,049.21, amounts with interest paid by defendants on complainant's account, leaving a balance of $1,405,520.91, to which should be added the amount of $46,155, unpaid salary of complainant, under the contract of April 1, 1926, leaving the definitive sum of $1,451,-675.91.

Thereupon, the Cherokee Mining Company and the Maya Corporation were given the option to discharge the equities of complainant as set out herein by accepting it in writing within thirty days, and paying certain costs and taxes. If not so accepted, and costs and taxes paid, then all their right, title, interest or claim of said corporations shall forever cease. If said acceptance is filed, and costs and taxes paid, said corporations shall in six months issue to complainant 5,797 further shares of preferred stock in the Maya Corporation, and 2,318 shares of common stock in it, and shall pay also in six months the amount due as settled by the decree, for the parties whose interests are there fixed. If this is done then all the interests of complainant and his associates shall forever cease, and be vested in Cherokee Mining Company and the Maya Corporation as their interests may appear: or, failing to do so, the interests of said companies and the "seven companies" shall be thereby vested in complainant, subject to certain equities between him and certain cross-complainants. The decree covers twenty pages of the transcript, and has much detail of finding and adjudication, not necessary now to mention.

■■ The conveyance of the land by the "seven companies" to the Cherokee Mining Company effected by the respondents is not such an act as of itself to confer on complainant any equitable right. If complainant has any equity, it is to enforce a vendor's lien by him as in the nature of specific performance available to a vendor. Morgan v. Lewis, 203 Ala. 47, 82 So. 7; 58 Corpus Juris 1236, note 99; 66 Corpus Juris 1459, note 28.

To make effectual such right, the Cherokee Mining Company holds the land in subordination to it, since that company is not a bona fide purchaser for value. 66 Corpus Juris 1250, note 1137.

It is in that sense a trustee de son tort, or ex maleficio. Such relation only exists to the extent that others have a beneficial interest sought to be fastened upon the property (Alabama Water Co. v. City of Anniston, 227 Ala. 579, at page 581, 151 So. 457; Lee v. Lee, 67 Ala. 406; Houston v. Farris, 93 Ala. 587, 11 So. 330), as where a creditor of the grantor seeks to subject the property to the payment of his debt by a creditor's bill, or one in that nature. .

■ The relief given a vendor is usually an ascertainment of the unpaid balance of the purchase price, a fixation of a time in which to pay it, and in default

of payment provision for a sale of the land for that purpose, as in Morgan v. Lewis, supra.

■ The purpose and effect of the decree here rendered is that of a strict foreclosure of the rights of defendants upon a failure to discharge the obligations found to constitute the consideration for the sale. The principle of strict foreclosure has been held to apply to this situation. 58 Corpus Juris, Specific Performance, § 589, p. 1237. But its application is very rare because unjust. It is treated as follows in Hitchcock's Heirs v. United States Bank of Pennsylvania, 7 Ala. 386, at page 442: "If the property mortgaged is clearly insufficient to pay the mortgage debt, we can see no reason why the mortgagee should be put to the expense of a sale, if he is willing to take a strict foreclosure. If the fact be not admitted, a reference might be made to the master to ascertain its value, and if the question were doubtful, and no consent given, certainly no such decree ought to be made." We do not find that the question has been treated in subsequent cases in Alabama.

There is no showing here of any such situation. A strict foreclosure was not authorized.

There are other comments available in respect to the decree, but it is not necessary for us to analyze it upon the basis of the court's finding as to the true nature of the contract. We cannot agree with the trial court that the agreement of the parties is represented by the alleged contract dated January 1, 1926, modified as he found, and only as thus modified.

Whatever was then discussed or agreed upon could not be put into effect, because of the failure of Cullinan to interest financial sources. Both parties understood this, and at least one substitute proposal was made and agreed on, but that could not be carried out. Smith had secured a postponement to April 10th of his large debt of $240,000, secured by mortgage, threatening foreclosure, and could not get a further extension. It was pressing heavily upon him, and his haste brought about the new agreement of March 24, 1926, whereby he could and did get it paid and saved his interest from probable loss. This was a very valuable consideration, as we view the evidence. Many features of that agreement are embraced in a letter of that date from Cullinan to Durbin, treasurer, which was personally approved by Smith, and is amplified in another letter from Cullinan to Coppinger, dated March 27, 1926, and explained in the testimony. When the transaction was closed and the $315,000 paid and stock in the Smith companies was assigned to Maya Corporation, and on April 12, 1926, in order to make sure that the parties were in agreement, Smith signed a letter carefully prepared in his presence to Durbin, when each paragraph was discussed and agreed on outlining the agreement "in order that the records will reflect briefly the conditions covering the payment on behalf of the Maya Corporation for me." In it he also stated, "that after the $315,000.00 advance, above outlined, has been paid in the manner agreed upon; thereafter my further interest in the properties *being delivered* to the Maya Corporation will be paid *for in stock of the Maya Corporation as* agreed upon." Nothing was there mentioned about any cash payable to him. But it is specific that he was to receive stock in the Maya Corporation for his interest in the properties *then delivered.*

It will also be noted that in suggesting the stock set up, outlined in the letter of March 24th, the preferred stock estimated to be needed for Smith was $700,-000. The acreage estimated by Smith at that time was 350,000 in round numbers. At $2 of preferred an acre (or two shares of preferred of $100 each for each 100 acres), the amount needed would be as estimated in that letter, for Smith of $700,000. It shows that this does not refer to the Tennessee River frontage in contemplation, for which other arrangements were suggested.

Paragraph five of the letter of March 24th is thus expressed: "Having acquired the stock and absorbed the loans without definite determinations as to ultimate acreage, it has been thought best to arrange with Mr. Smith on the basis of a fixed price per acre for approved titles; hence, we have agreed (taking Mr. Catlin's figures as a basis) on $—— per acre part payment against loan, the balance in Maya Corporation preferred stock at par, the latter to be issued as title is perfected." There is here some ambiguity. The letter of March 27th has this to say: "Referring to the blanks left in my letter of the 24th addressed to Mr. Durbin, as applied to the 5th—the agreement is that after paying off the $300,000.00 of bank

loans, the Maya Corporation will issue to him two (2) shares of preferred stock and one (1) share of common stock for each one hundred (100) acres accepted. * * * Assuming the acreage so accepted will fall somewhere between the amount submitted by Mr. Smith and check made by Mr. Catlin, the amount to be credited to Mr. Smith for this acreage would be at around $2.90 per acre." Cullinan made the following statements in explanation, in his testimony in the Delaware suit: "And he (Durbin) was to deliver later on approved title two shares of preferred stock which would have made under the upset $2.90 calculated on our basis. If the acreage was less we paid more. If the acreage was more we paid less but it would have formed, according to all of the evidence that we had, somewhere between $2.80 and $3.50. (Question by Mr. Johnston): Based on whether it was 337,000 or 354,000 or more acres? If it was one acre that we received we would have paid $300,000 for it in cash. If it were two acres we would pay $150,000 and it went on the same ratio, depending on the acreage entirely. (Question by the court): That having been put to the necessity if the agreement was to be made of providing forthwith the sum of $300,000 for whatever acreage you might get, then the amount of cash that would be allotted or assigned to each acre, depended upon the number of acres that you should eventually get? Yes, as represented; but the 337,000 and 354,000 the amount that was then under discussion. (Question): Being more than 300,000 acres, the price would be less than a dollar an acre in cash, and how much would depend upon whether it was 334 or 335 or 337? Or even it might be less, as it proved to be. * * * (Question): In other words, this was the contract, he (Smith) was to turn over his acreage to the Maya Corporation and the Maya Corporation was going to pay him $300,000 and give him two shares of preferred stock for every 100 acres he had. When was this stock to be given to him? On approved titles. * * * The agreement was to begin with that we were to put over the $300,000 subject to the confirmation or consummation at the point of issuance at Birmingham, and in addition to that to issue to Mr. Smith two shares of preferred stock in the Maya Corporation for each 100 acres of approved titles, the stock to be issued after the moneys had been absorbed that were advanced, the $300,000. The basis of that made it approximately as we figured it out 90 cents an acre in cash and $2.00 an acre in stock as against Mr. Smith's offer of $3.00 an acre."

We understand that to mean that Maya was to pay $300,000 as a part of the consideration for the land of Smith which was then passing; that in addition Maya was to issue to him two shares of preferred stock (of the par value of $100 each) with proportionate amount of common (with no par value) for each 100 acres whose title should be approved; that Smith thereby received $300,000 regardless of titles or acreage. This was independent of a loan to Smith of $15,000, for which he executed his note. This theory of the agreement is well supported by other witnesses.

On April 23, 1926, while Smith was still in the management, the treasurer of Maya, Mr. Durbin, writes Smith that in connection with the acquisition of the share in the Smith companies, it is proposed to issue to him or the record owner of that stock 2,500 shares of preferred and 1,000 shares of common stock in Maya Corporation, and follow the practice of checking up the position at the end of each quarter and issuing other installments to the extent that he is entitled to additional stock under the agreement. To this Smith replied as of April 27th, that all stock which was to be in partial settlement was to issue to him. In the letter dated May 3, 1926, stock certificates so aggregating appear to have been issued and sent to Smith as a first installment under the agreement in connection with the acquisition of his shares in the corporations named. The letter of July 9, 1926, shows that this arrangement related to the land of the companies whose stock passed in the April transaction, and to those included in the alleged statutory warranty deed of Smith and his son, which has not been executed. The letter to Smith of July 15, 1926, relates to the second installment, naming a total acreage of 324,759 standing in the name of the former Smith companies and Smith and son in their statutory warranty deed (though no such deed was shown to exist), and for such acreage the second installment of 2,500 shares of preferred and 1,000 shares of common stock were issued, and sent in the letter of July 20,

1926. At the rate of the two shares of preferred and proportionate common for each 100 acres, this represented 250,000 acres. Smith had written the letter of June 12th that it would take about two and one-half years to get the lands abstracted.

These incidents show that this stock was issued for the land included in the April transaction pursuant to a practice of checking the position, evidently as to title, at the end of each quarter.· But titles were not then approved nor abstracts made. This issuance of stock proves, first, a waiver of the condition precedent that it will not be done except as the title shown by abstracts is acceptable; two, a performance of the contract by Maya to that extent; and, third the nature of the contract in respect to the obligations of Maya. But it does not relieve Smith of the burden of insufficient titles as to that acreage, and puts Maya in the attitude of a purchaser of that acreage under a covenant that the title as abstracted will be acceptable without stipulation as to its effect if not acceptable. During these transactions no claim was made for cash as a part of the consideration or that there was a different arrangement as to the stock to be issued.

All this correspondence shows that thus negotiating and agreeing and conducting themselves the parties were providing for compensation to Smith for the land that passed by the assignment of the stock in his corporations as well as other land supposed to be then conveyed by him to Maya.

We have reached the conclusion that the alleged contract of January 1, 1926, if executed at all, as to which we need not inquire, was either but tentative and dependent upon Cullinan being able to make the necessary financing to put it into effect, which was never done, or if intended to be definitive was abrogated and a new one made as of March 24, 1926, under which the parties acted, and which was partly performed on or about April 10th, and whose terms we have herein stated.

Smith has received as the consideration for his land $300,000, and 5,000 shares of preferred together with 2,000 shares of common stock. He is not due any more money under the contract, nor any more stock unless the title to more than 250,000 acres shown by abstracts is accept-able to Maya. This has not been undertaken to be shown by Smith nor claimed to exist, and he is not entitled to any relief in this suit.

### Cross-Bill of Maya Corporation.

The equity of the cross-bill was sustained on the former appeal reported in 227 Ala. 6, 148 So. 621.

As we have observed, the stock issued to Smith was a waiver of the condition precedent that the title shown by abstract should be accepted before the stock should issue on the basis agreed, but it was waived only to the extent that such was issued, representing 250,000 acres. But this did not relieve Smith of the duty of making the titles to that amount of acreage acceptable, in so far as stock was the consideration; although regardless of acreage or titles no part of the $300,000 advanced is due to be refunded by Smith. But Smith owes $15,-000 loan made to him not as a part of the consideration of the land, but to be repaid in some form.

Cross-complainant contends that only about 85,511 acres had title shown by the abstracts which were acceptable. Besides the claim of Leo K. Steiner and Street and Bradford set up in their cross-bills, there were debts against the Smith corporations which were settled for about $7,000. This does not include the outlay for abstracting which Smith had agreed to do.

The agreement does not stipulate that all this land has good title and is free of liens. But the amount of stock to be issued is controlled by the acreage of such land as has a title shown by abstract to be acceptable to Maya. And while the corporations owed more than as represented by Smith, those amounts aggregated about $7,000 which had to be paid, besides the claim of Leo K. Steiner, and Street and Bradford.

The position of Maya is that of a purchaser of 250,000 acres of land paid for with a stipulation that the title shown by abstracts shall be acceptable. The right of Maya on a failure of such acceptable title is not to rescind as here sought, but to call upon Smith for an adjustment of the stock issue in the amount agreed on for the acreage whose title is thus defective. If by issuing the stock in advance of accepting the title, Maya has placed itself in an unsatisfactory position, it is not one which justifies a rescision. The prayer for a rescision cannot be granted. But Maya prays in the alternative for a cancellation

of stock to the extent that the title has proven unacceptable. Some of it has been hypothecated to Steiner to secure a personal loan to Smith. Maya makes no claim of right as to that. But others also claim ownership of some of it.

■ Maya is a Delaware corporation. Its shares of stock, though intangible, have a situs in Delaware for certain purposes and are subject to its laws which control its assignments and liens and equities pertaining to its ownership in so far as the rights of the corporation are involved. 20 Corpus Juris Secundum, Corporations, p. 21, § 1802; 13 Am.Jur. 320, section 204; Hammond v. Hastings, 134 U.S. 401, 10 S. Ct. 727, 33. L.Ed. 960; 15 Corpus Juris Secundum, Conflict of Laws, p. 931, § 18; 18 Corpus Juris Secundum, Corporations, p. 940, § 399.

■ While individual stockholders may deal with the stock subject to the laws of the state where the contract is made, and to be performed (18 Corpus Juris Secundum, Corporations, p. 1006, § 419, note 15), their relative rights as respects the corporation itself are controlled by the law of the state of incorporation. Authorities supra.

■ If Maya has a lien on the stock of a stockholder for a debt due it, or for a stock adjustment due to be made by him, it is by virtue of a statute, such as our section 7000, Code, or by stipulation. That would be controlled by the laws of Delaware, not Alabama, or by the stipulation of the parties, that is, by the corporation and stockholder. There is no such stipulation. If there is a statute of Delaware, it is not pleaded or proven.

There is a suit pending in Delaware between the parties, which we are told involves this question, and in which their rights in this respect may be fully determined.

There is not in this suit sufficient evidence on which to make decree doing justice to all parties on that question. In denying relief on the cross-bill, there was no reversible error, but it is without prejudice to the rights involved and which may be determined in the Delaware suit.

*Cross-Bill of Street and Bradford.*

They were made parties to the original bill and cross-bill of Maya, but no relief was sought against them in either, and no facts alleged which are sufficient to bring them in. Their cross-bill seeks to foreclose what it calls a mortgage, but in the form of a promissory note in which there purports to be given as security a lien on land in ranges 7 and 8 in DeKalb County, embraced and described in a certain suit. This instrument purports to be executed by Alabama Coal and Iron Company, one of Smith's seven companies, on August 6, 1925, recorded August 8, 1925.

■ There is no demurrer to the cross-bill and the answer to it does not set up the defense urged in argument, first, that it was not duly executed; second, that there was an absence of sufficient consideration; and, third, that it is ultra vires, in that it is an assumption without consideration of a debt owing by Smith, if by anyone. So that we cannot consider those questions. All of them must be set up in pleas or the answer. There is but a general denial of the allegations of the cross-bill.

We are here and now dismissing the original bill because not sustained by the proof and for like reason dismissing the cross-bill of Maya, which disposes of the controversy so far as this suit is concerned, which called into exercise the jurisdiction of the court of equity. Street and Bradford were not concerned with that controversy and their claim in no way affected it nor the relief sought in the bill or cross-bill.

■ Parties to a suit and interveners are restricted by well known principles in the assertion, by cross-bill of independent and unrelated controversies. Hawkins v. Holman, 239 Ala. 541, 195 So. 880; Emens v. Stephens, 233 Ala. 295, 172 So. 95; Leath v. Lister, 233 Ala. 595, 173 So. 59; Maryland Casualty Co. v. Holmes, 230 Ala. 332, 160 So. 768.

Street and Bradford in answer to the original bill merely admit its allegations. In answer to the cross-bill of Maya they assert no interest in nor knowledge of the controversy there set out, but only desire to be in position to secure decree against the parties *in event Smith succeeds in proving the existence and validity of the contract* on which he bases his right.

■ The cross-bill of Street and Bradford is a part or feature of their answer to the original bill. Their claim is one derived from Smith, using one of his corporations as an instrumentality, in the form of a note and conventional lien, signed by both Smith and his corporation. It is therefore one claimed to be adverse, prior and supe-

rior to the asserted rights of Smith in this suit, but in their answer to the Maya cross-bill declare that it is only asserted in event Smith sustains his claim. Such a claimant cannot be made a party for the purpose of litigating his right and title. Randle v. Boyd, 73 Ala. 282; Hodge v. Joy, 207 Ala. 198, 92 So. 171.

We do not say that all the parties may not by unanimous consent try such issue in connection with the trial of the controversy which has invoked equity jurisdiction, or that a failure to raise any objection on that account does not amount to such consent. But when all relief is denied, the parties in respect to their controversy which has thus invoked such jurisdiction, and their bill and cross-bill are dismissed, not being sustained by the proof, such independent matter not arising out of the subject matter of the original bill should go with it, especially in view of the conditional manner in which the parties declare they wish to assert it. Emens v. Stephens, supra; Ex parte Conradi, 210 Ala. 213, 97 So. 569; Bell v. McLaughlin, 183 Ala. 548, 62 So. 798; Etowah Mining Co. v. Wills Valley Mining Co., 121 Ala. 672, 25 So. 720.

### Cross-Bill of Leo K. Steiner.

He was not made a party to the original bill filed January 12, 1929. The original cross-bill of the Maya Corporation was filed June 25, 1931. We have shown that it sought a rescission of the contract made March 24, 1926. It made Leo K. Steiner a party and made allegations as to him in two aspects: first, that he held some of the stock of Maya which had been issued to Smith as collateral for a loan to him, but that he had notice of Maya's equitable right of rescission (this has been eliminated by counsel in brief) ; and, second, the existence of Steiner's asserted claim against Southern Exploit Company, as set up in his cross-bill, which it alleged was instigated by Smith. The second feature was in support of Maya's claim of fraud in representing that there were no debts against any of the seven companies other than those which were being paid. Leo K. Steiner had sued said corporation at law on that claim as alleged. It then asserted matter to show that in fact said claim was not well founded or if so that he should be estopped from pressing said suit so long as this transaction is not effectively rescinded.

The cross-bill prayed for a temporary restraining order against Smith and Steiner prohibiting the transfer of the Maya stock held by them. This does not appear to have been issued. There was no other relief prayed as to Steiner, except such as was incidental to a rescission as it may affect his collaterally held stock. The Southern Exploit Company and Cherokee Mining Company were not made parties to this cross-bill.

Leo K. Steiner on August 8, 1931, filed an answer in which he prays for relief as in a cross-bill. He denies that Smith caused him to assert his claim and suit against Southern Exploit Company. He declares the correctness of his claim against Southern Exploit Company, for which he has sued at law. He declares the bona fide existence of his collateral loan to Smith and his holding of the Maya stock as security.

The cross-bill seeks a personal judgment for the amount he loaned Smith, claiming same against Cullinan, Cherokee Mining Company and Maya, and establishing a lien in his favor on all the land in this suit, and a satisfaction of said judgment by a sale of said lands if necessary. Southern Exploit Company is not made a party, and no footnote is attached. No parties are especially so made. No answers to this cross-bill appear. It seems to have been treated more as an answer than a cross-bill, though specific relief was prayed as we have indicated. On March 8, 1938, he filed a cross-bill in that form with prayer and footnote, as an amendment to the foregoing answer. He makes all the companies parties, also Smith and Street and Bradford. In it, he sets up his claim against Southern Exploit Company under contract made in 1925, and its partial performance until it was breached in July 1926, and thereafter that it acquired land and rights on which he was due to be paid under it, but was not, all as set forth in his suit at law. He then alleged that the deed made by Southern Exploit Company to Cherokee Mining Company in December, 1926, of all its lands was without consideration and voluntary, and should be subjected to the payment of his claim. All the corporate respondents in the cross-bill filed an answer merely denying the averments of the cross-bill and no other defense has been set up in pleading to it. Relief was granted cross-complaint in that cross-bill.

The question is whether such a cross-bill goes out with the original bill

382

and the Maya Corporation cross-bill. As we have heretofore observed, a cross-bill goes out with the balance of the suit unless the relief sought grows out of the subject matter of the main controversy, and has independent equity.

 It is claimed to have independent equity because Maya, which owned both Southern Exploit Company and Cherokee Mining Company, caused the lands of the former, as a debtor to Steiner, to be conveyed to the latter corporation without consideration. This may furnish independent equity, but it does not grow out of the subject matter of the original bill nor of the Maya cross-bill in so far as their controversy was concerned.

If a cross-bill is merely to obtain redress from one not liable to the complainant in the original or cross-bill, it could not be considered as growing out of that litigation. Lowery v. Rosengrant, 216 Ala. 364, 113 So. 237; Tutwiler v. Dunlap, 71 Ala. 126; Behan v. Friedman, 216 Ala. 478, 113 So. 538; Maryland Casualty Co. v. Holmes, 230 Ala. 332, 160 So. 768; Hawkins v. Holman, 239 Ala. 541, 195 So. 880; Fidelity & Deposit Co. v. Wilkinson, 230 Ala. 586, 162 So. 666.

This is first an answer to a cross-bill, and was filed in 1931 without praying for such relief, then in 1938 it was amended so as to make it also a cross-bill to a cross-bill, and the relief sought is merely to obtain redress from one who was not a party to the cross-bill to which it was filed as a defense, and though such cross-bill did mention the same matter, it was purely incidental in so far as Leo K. Steiner was concerned, and not brought forward seeking relief until nearly ten years after the suit was begun. It was not an adjustment of equities between those who may be held liable to the cross-complainant in the cross-bill sought to be answered, nor in respect to the rights of the complainant in the original bill.

 Moreover, section 6550, Code, has never been held to authorize a cross-bill to a cross-bill. It was observed in Lamar v. Lincoln Reserve Life Ins. Co., 222 Ala. 60, at page 65, [12], 131 So. 223, that this is an anomaly in equity pleading. And so it is as far as our research extends. The amendment of that section, Gen.Acts 1937, Sp. Sess. page 208, made no change in this respect.

Under the rules of equity pleading observed by us, we cannot retain this as a cross-bill to a cross-bill and grant relief when it is denied to the parties in respect to the subject matter of the suit.

The point is made that there is no order of court providing for a severance in the assignment of errors: that this assignment is joint; and that therefore all errors not jointly available to all who assign errors are not available to any of them.

 True, we have often followed the rule that when there is a joint assignment and no severance ordered, the errors must be jointly available to all so joining in them. 2 Ala.Dig. 626, Appeal and Error, ⊜721(1). But we have never held that when errors are separately and severally assigned, there must be an order of severance to make them separately and severally available, unless their claim of error is joint and not several. Prior to our section 6143, Code, an appeal was required to be sued out in the name of all parties against whom a joint judgment was rendered, though one or more of them refused to participate in the joint right. In such case, the practice was to appeal in the name of all who had such joint right, and then have an order of this Court for a summons to those not participating, that they may join in the assignments of error if they wish, and on their failure to do so the court would allow a severance so that those who did participate may have the benefit of errors which were jointly available to them and to those not participating. 2 Ala.Dig. 494, Appeal and Error, ⊜324; Savage v. Walsh, 24 Ala. 293; Moore v. McGuire, 26 Ala. 461.

Section 6143, Code, made a change in that practice. So that an appeal may be taken in the name of one only in such a judgment when the clerk of the trial court shall issue a summons to the others. But without the statute a party aggrieved by a judgment or decree could appeal without joining others when their interests are separate, not joint. 4 Corpus Juris Secundum, Appeal and Error, p. 857, § 393(c); 4 Amer.Jur. 992, section 239; Mancil v. Thomas, 216 Ala. 623, 114 So. 223. Compare Long v. Holden, 216 Ala. 81 (2 and 3), 112 So. 444, 52 A.L.R. 536.

 At no time is severance necessary except when there is a joint interest in the right of appeal and the right and duty to assign joint errors, and some of the parties to such right refuse to join in the appeal or in the assignments. The purpose

is to enable some of them by an order of severance to get the benefit of an error which is jointly available only. 4 Corpus Juris Secundum, Appeal and Error, p. 858, § 394; 2 Amer.Jur. 990, sections 237, 238.

But there is never a necessity for an order of severance in the assignment of errors unless some of the joint parties affected refuse to participate. Of course if assignments are jointly made, they must be of joint prejudice to all those thus joining. But if the errors assigned are of separate prejudice and they are separately assigned, there is no occasion for a severance. The severance is only to break down the necessity of all parties to a joint claim of error participating in the assignment of that error. But if the claim of error is separate and not joint, no such breaking down is appropriate.

Here the errors were all assigned "separately and severally." The Maya is the chief party affected. Some of the "seven companies" are separately affected by the respective cross-bills. They are not jointly asserting a claim of error in such respect as needs a severance to permit separate assignments. Moreover, they are but the instrumentalities. of the main parties—Smith and Maya. The real controversy in all aspects is between them. Maya as well as the other companies assign errors separately, and they should be so considered.

The costs of the appeal in this Court and in the Circuit Court, in Equity, are all taxed against W. L. Smith. All costs which accrued prior to this appeal are taxed as follows: That which accrued at the instance of Street and Bradford, with respect to their cross-bill, is taxed against them; that which accrued at the instance of Leo K. Steiner, with respect to his cross-bill, is taxed against him. All the balance of the cost is taxed equally against Maya Corporation and W. L. Smith.

The judgment of the Marshall Circuit Court, in Equity, is reversed, and one is here rendered dismissing the original bill as amended and dismissing all cross-bills, but without prejudice to the rights of cross-complainants in respect to their enforcement in any pending cause in any court.

Reversed and rendered.

GARDNER, C. J., and BOULDIN and LIVINGSTON, JJ., concur.